**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| **SCOT CARLEY, on behalf of Himself and All Others Similarly Situated,** | |
| **Plaintiff,** | **NO. MO:15-CV-00161-RAJ-DC** |
| **VERSUS** | |
| **CREST PUMPING TECHNOLOGIES, LLC** | |
| **Defendant.** | |

**MOTION FOR SUMMARY JUDGMENT**
**ON CLAIM OF PLAINTIFF, SCOT CARLEY,**
**AND INCORPORATED MEMORANDUM IN SUPPORT**

**NOW INTO COURT**, through undersigned counsel, comes Defendant, Crest Pumping

Technologies, LLC ("Crest"), who respectfully moves this Court for summary judgment on the

overtime claim asserted by Plaintiff, Scot Carley ("Carley") under the Fair Labor Standards Act,

29 U.S.C. § 201, *et seq*. Crest is entitled to summary judgment because there are no genuine

issues of material fact for trial on Carley's claim. Therefore, based on the undisputed facts and

law, Carley's claim should be dismissed pursuant to Federal Rule of Civil Procedure 56, with

prejudice and at Carley's cost.

## I.   INTRODUCTION

Carley worked as a cement service supervisor, also referred to as a "cementer," for Crest,

was paid an annual salary of $90,000, and earned more than $100,000 in total compensation on

an annualized basis. At all times during his employment with Crest, Carley was exempt from

overtime under one or more of the FLSA's exemptions, more specifically the highly-

compensated employee exemption, 29 U.S.C. § 213(a)(1) and 29 C.F.R. § 541.601(a); the

executive exemption, 29 U.S.C. § 213(a)(1) and 29 C.F.R. § 541.100; and/or Motor Carrier Act ("MCA") exemption, 29 U.S.C. § 213(b)(1).

## II.   STATEMENT OF UNCONTESTED MATERIAL FACTS

1.      Crest provides downhole cementing, acidizing and pump down services to meet the expectations of operators for complex unconventional and conventional wells. Exhibit 2, Declaration of Kevin Dennis, ¶ 3. Crest engages in the interstate transportation of oilfield equipment, chemicals, and dry cement. Exhibit 2, ¶ 7. Crest is a motor carrier regulated by the U.S. Department of Transportation ("DOT") operating under USDOT Number 2264972, and has been a registered motor carrier since 2012. Exhibit 2, ¶¶ 5-6, and Exhibit A thereto.

2.      Crest hired Carley as a cement service supervisor, also referred to as "cementer," in February 2014, to work out of Crest's Sweetwater, Texas location. Exhibit 1, Deposition of Scot Carley, April 8, 2016, pp. 88-90.

3.      Carley had a commercial driver's license ("CDL") while employed at Crest. Exhibit 1, p. 8.

4.      Carley was paid a salary plus job bonuses at Crest. His starting salary was $90,000 and his starting bonus was $200 per job. Exhibit 1, pp. 84-6; Exhibit 2, Exhibit C thereto.

5.      Carley was employed by Crest as a cementer from February 18, 2014, to June 10, 2014. Exhibit 1, pp. 88-90, 110; Exhibit 2, Exhibit C thereto.

6.      During his sixteen weeks of employment with Crest, Carley earned total gross wages of $47,682.93, which is more than $154,000 on an annualized basis. Exhibit 1, pp. 86-8; Exhibit 2, Exhibit B thereto.

7.    At the time of hire, Crest issued the following items to Carley that were required for his job: laptop computer, portable printer, cell phone, and a company credit card. Exhibit 1, pp. 90-2, 98.

8.    Carley was also issued a company vehicle, a Ford 350. Carley was assigned the same Ford 350 during his entire employment with Crest. Although Carley testified he "believed" he was issued a Ford 250, Crest's business records confirm that Carley was issued Vehicle #110047, a 2014 Ford 350, which Carley confirmed was the vehicle assigned to him. Exhibit 1, pp. 100-1, 188-9; Exhibit 2, ¶ 15, and Exhibit D thereto.

9.    A Ford 350 has a gross vehicle weight rating of 11,500 pounds. Exhibit 2, ¶15.

10.    Every job that Carley worked on at Crest used a cement crew which included a cementer, a pump operator, and at least one bulk truck driver, also known as a bulky. Exhibit 1, pp. 140. The cementer is the highest-ranking member and leader of the crew. Exhibit 1, p. 166; Exhibit 3, Deposition of David Crombie, March 29, 2016, pp. 17, 20.

11.    In the hierarchy of the cement crew, the cementer ranks higher than the pump operator, who ranks higher than the bulk truck driver. Exhibit 1, pp. 36-7.

12.    As the cementer, it was Carley's responsibility to make sure "that every member of the team is doing what they're supposed to do." Exhibit 1, p. 215.

13.    As a cementer at Crest, Carley was asked to train a pump operator, James, "to show him how to do the calculations … for figuring out your cement weights and your slurries and displacement." Exhibit 1, pp. 198-9.

14.    Part of Carley's job as a cementer was to point out potential problems to the company man, or the customer's representative. Exhibit 1, p. 204.

15.    Carley considered his main job responsibilities to be completing the job in a safe manner, *i.e.* making sure it is done correctly and safely. Exhibit 1, p. 214.

16.    Crest management sought Carley's input when Crest was making a hiring decision regarding an applicant for a cementer position. Exhibit 1, pp. 193-4.

17.    One of Carley's other job duties was to provide feedback to Crest management on the performance of members of Carley's cement crew, something that Carley did frequently. Exhibit 1, pp. 230-5; Exhibit 2, Exhibits E-L thereto.

18.    One of Carley's job duties as a cementer was to address problems with any of the work that was being done by a member of his cement crew. Exhibit 1, p. 149. Carley had to report a repeated problem with his pump operator, James, who had failed to properly clean a pump. Exhibit 1, pp. 146-7.

19.    Carley kept a tally book, which he used to document information he received from the company man including the size and weight of the casing and the depth of the hole and to perform calculations needed for the job, including figuring out his displacement. Exhibit 1, pp. 167-168.

20.    Carley pulled a trailer with his Ford 350 for jobs he worked on at Crest, either a boost trailer or an air trailer. Exhibit 1, pp. 153-4. A boost trailer has a gross weight rating of 12,000 pounds. Exhibit 2, ¶ 9. An air trailer has a gross weight rating of 15,000 pounds. Exhibit 2, ¶ 10.

21.    Crest's cementers, including Carley, were required or reasonably expected to travel across state lines to provide services to customers, including traveling from Texas into New Mexico. Exhibit 2, ¶¶ 18-19.

22.     Crest requires cementers to complete a lot more paperwork than the other cementing companies Carley worked for. Exhibit 1, p. 123.

23.     Before going to the job site, Carley would confirm the equipment that he was supposed to take to the job as well as the cement blends. He would check to make sure the right cement blend had been prepared and that the right size cement head was selected. Exhibit 1, pp. 151-3.

24.     Carley would verify all of the load sheets for all of the members of the cement crew. Exhibit 1, p. 160.

25.     Before leaving the yard for a job, Carley would conduct a JSA (which refers to Job Safety Analysis) meeting, wherein the crew would be informed of the job location, route, and other details. Exhibit 1, p. 140-3, 160-1.

26.     Carley determined the order in which the crew would convoy to the job site as well as the route they would take. Exhibit 1, pp. 160-1.

27.     The cementer would transport the cement head, a piece of equipment that connects to the well casing for pumping operations, in the back of his truck. Cement heads vary in size  and are heavy. Exhibit 1, pp. 154-5.

28.     When the crew arrived at a job site, it was the cementer's job to meet with the company man to get all of the pertinent information about the job. Exhibit 1, p. 163. Carley considered that part of his job was making sure the company man was satisfied with Crest's performance. Exhibit 1, p. 215-6.

29.     While at the job site, Carley would conduct multiple JSA meetings. Exhibit 1, p. 173-4. The first occurred upon arrival at the site, before the job is "rigged up," which refers to laying and connecting the pipe and lines through which cement and displacement fluid are

pumped. Exhibit 1, pp. 171-4. A JSA meeting also occurred before the job is pumped – this meeting involves the customer representative and all other personnel at the job site. Exhibit 1, pp. 174-5.

30.     After pumping is complete, the plug is dropped and displacement fluid is run through the lines. Exhibit 1, pp. 177-8.

31.     Following displacement, the job is rigged down, which is faster than rigging up. Exhibit 1, pp. 178-9.

32.     Pumping and displacement operations are the longest parts of any job performed on site. Exhibit 1, p. 180.

33.     Carley was required to complete and turn in paperwork at the end of each job including a job narrative, JSAs, job tickets and charts. Exhibit 1, p. 127.

34.     The primary duty of a cementer, including Carley, is to direct and supervise the other members of the cement crew – the pump operator and bulk truck drivers – in the performance of the job, and to oversee the successful completion of the job. Exhibit 2, ¶ 12; Exhibit 3, pp. 17, 20.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Moreover, summary judgment on an affirmative defense is proper when the

movant establishes all the elements of that defense. *Citigroup, Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 371 (5th Cir. 2011) (citation omitted).

## IV.   LAW AND ARGUMENT

The FLSA establishes minimum wage and maximum hours (*i.e.,* overtime) standards for covered employees. 29 U.S.C. §§ 206-7. The FLSA enumerates various exemptions from the minimum wage and/or overtime requirements. Section 213(a) of the FLSA exempts from these requirements "any employee employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary, . . . .)." The U.S. Department of Labor ("DOL"), which enforces and has promulgated regulations and guidance interpreting the FLSA, promulgated regulations defining and delimiting these exemptions in 29 C.F.R. §§ 541.0, *et seq.* Subpart A, the General Regulations, stated that the "exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2.

The FLSA established minimum labor standards in order to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). The statute was designed to "aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil,* 65 S. Ct. 895, 902 n. 18, 324 U.S. 697, 707 n. 18, 89 L. Ed. 1296 (1945). However, as the Supreme Court more recently noted in *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 183 L. Ed. 2d 153 (2012), the FLSA was not intended to apply to well-compensated employees, referring to those who earned approximately $70,000 annually.

**A.      Carley Was Exempt Under the Highly-Compensated Exemption.**

In defining the highly compensated employee exemption, the DOL has expressly recognized that:

> **A high level of compensation is a strong indicator of an employee's exempt status**, thus eliminating the need for a detailed analysis of the employee's job duties. Thus, a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee . . . .

29 C.F.R. § 541.601(c) (emphasis added). This exemption is available for an "employee with **total annual compensation of at least $100,000**" if he customarily and regularly performs at least one of the duties or responsibilities of an executive, administrative, or professional employee. 29 C.F.R. § 541.601(a) (emphasis added). "Total annual compensation" must include at least $455 per week on a salary or fee basis and may include "nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period." 29 C.F.R. § 541.601(b)(1). "An employee who does not work a full year for the employer . . . because the employee . . . ends the employment before the end of the year, may qualify for exemption under this section if the employee receives a *pro rata* portion of the minimum amount [$100,000 total annual compensation]" based on the number of weeks the employee has been employed. 29 C.F.R. § 541.601(b)(3). The calendar year applies for the purpose of this evaluation in the absence of any other designated 52-week period. 29 C.F.R. § 541. 601(b)(4).

Carley qualifies as a highly-compensated employee. It is undisputed that Carley was paid a starting annual salary of $90,000. Exhibit 1, pp. 84-6; Exhibit 2, Exhibit C thereto. During the sixteen weeks that Carley worked for Crest, Carley earned gross wages of $47,682.93, which is more than $154,000 on an annualized basis. Exhibit 1, pp. 86-8; Exhibit 2, Exhibit B thereto. Thus, on an annualized basis, Carley earned compensation well in excess of $100,000, so the

terms of employment offered to Carley were far from "substandard" or "oppressive," but instead was more than twice the level of compensation at issue in *Christopher v. SmithKline Beecham Corp.* The background of and purpose underlying the FLSA must be considered in light of these undisputed facts so as not to achieve an illogical or absurd result, particularly in light of the substantial compensation paid to Carley, which satisfies the threshold requirement for the highly compensated employee exemption.

Carley also meets the duty requirement of the highly-compensated employee exemption because he "customarily and regularly perform[ed] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee . . . ." 29 C.F.R. § 541.601(c). Carley performed all of the duties of an executive employee, such that he easily meets the requirements for the highly-compensated employee exemption, which only requires performance of <u>one</u> exempt duty coupled with Carley's high compensation.

A cement crew consists of a cementer, a pump operator, and at least one bulk truck driver, also known as a bulky. Exhibit 1, p. 140. The cementer is the highest-ranking member of this crew. Exhibit 1, p. 166. Each job Carley worked on at Crest required at least one cementer, one pump operator, and one bulky. Exhibit 1, p. 140. As the cementer, it was Carley's responsibility to make sure "that every member of the team is doing what they're supposed to do." Exhibit 1, p. 215. Carley considered his main job responsibilities to be completing the job in a safe manner, *i.e.* making sure it is done correctly and safely. Exhibit 1, p. 214. The primary duty of a cementer, including Carley, is to direct and supervise the other members of the cement crew – the pump operator and bulk truck drivers – in the performance of the job, and to oversee the successful completion of the job. Exhibit 3, ¶ 12.

"An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100."[1] 29 C.F.R. § 541.601(c). Thus, as conclusively shown by the undisputed facts above, Carley customarily and regularly directed the work of two or more employees and, thus, met this element of the executive exemption, such that the highly-compensated employee exemption applied.

*Allen v. Coil Tubing Services, L.L.C.*, 846 F. Supp. 2d 678 (S.D. Tex. 2012), *aff'd*, 755 F.3d 279 (5th Cir. 2014), is instructive. In considering the highly-compensated employee exemption, the court found that, to the extent the compensation threshold was satisfied, a service supervisor for an oilfield services company satisfied the duty requirement for the exemption because: (1) he customarily and regularly directed the work of two or more employees; and (2) he had the authority to fire the employees he supervised under limited circumstances and in fact provided input into the discipline, promotion, and firing decisions made by his superiors. *Id*. at 710-11. Like Carley here, the service supervisor was the highest ranking employee in the field at his projects, and he was required to supervise "all coil tubing, pumping, nitrogen and carbon dioxide operation at the job site" and "all Company Personnel assigned to the job [project] site." *Id*. at 709. Thus, the court found the service supervisor's duties satisfied the executive exemption, regardless of whether he "also performed manual labor alongside the [technicians] he supervised while in the field." *Id*. at 695. The same result is warranted here, where the

---

[1] To be clear, Carley meets all of the executive exemption duty requirements, the rest of which are discussed in the next section. Only one duty is discussed here as only one is needed to satisfy the highly-compensated employee exemption.

undisputed facts show that Carley's primary responsibility was to supervise his crew and make sure they did their jobs.

**B.      Carley Was Exempt Under the Executive Exemption.**

The executive exemption applies to an employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

> (3) Who customarily and regularly directs the work of two or more other employees; and

> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). The terms "primary duty," "management," "department or subdivision," "two or more other employees," and "particular weight" are further defined in separate regulations. 29 C.F.R. §§ 541.100, 102-105, and § 541.700. Carley clearly earned more than the minimum required salary and customarily and regularly directed the work of two or more employees, as shown above, so this section addresses the second and fourth requirements for the executive exemption.

**1.      Carley's primary duty was management of a customarily recognized department or subdivision of Crest.**

Carley's primary duty was to manage his crew, which is a customarily recognized department or subdivision of Crest. The Code of Federal Regulations defines an employee's "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "To determine an employee's primary duty, the Court looks

to the job responsibilities that are 'of principal value to the employer.'" *Allen v. Coil Tubing Services, L.L.C.*, 846 F. Supp. 2d 678, 706-07 (S.D. Tex. 2012), citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990). The Fifth Circuit has made clear that "[a]n employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work." *Dalheim*, 918 F.2d at 1227. The DOL has enumerated certain factors to consider when determining the primary duty of an employee, which

> include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* at 707, citing 29 C.F.R. § 541.700(a). Time is not the sole test, but "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.*, citing 29 C.F.R. § 541.700(b). Management of the enterprise includes, but is not limited to:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.*, citing 29 C.F.R. § 541.102.

The undisputed facts overwhelmingly show that Carley's managerial responsibilities as defined for this exemption were extensive and of primary importance. As a cementer at Crest, **Carley was the highest-ranking member and the supervisor of the crew**. Exhibit 1, p. 166. It was Carley's responsibility to make sure his cement crew members did what they were supposed to do. Exhibit 1, pp. 215. Carley had responsibility for training other employees on his cement crew. Exhibit 1, p. 198-9. Carley was also responsible for providing for the safety of the employees, including by holding several JSA (Job Safety Analysis) meetings both before and after the crew arrived at the job site. Exhibit 1, pp. 140-3, 160-1, 173-5. The primary duty of a cementer, including Carley, is to direct and supervise the other members of the cement crew – the pump operator and bulk truck drivers – in the performance of the job, and to oversee the successful completion of the job. Exhibit 2, ¶ 12. Thus, as a cement service supervisor, Carley's primary duty was managerial within the meaning of the executive exemption. *See Allen*, 846 F. Supp. 2d at 707, n. 65 (finding the service supervisor's primary duty was managerial where the service supervisor's responsibilities were extensive and of primary importance, where the service supervisor's field oversight duties were "crucial to the business" of the employer, where he was the senior employee on all projects to which he was assigned in the field, and where he planned, assigned, and managed the work of the employees he supervised).

Additionally, a cement crew constitutes a customarily recognized department or subdivision under the FLSA. The management of "a customarily recognized department or subdivision" is intended to distinguish between a "collection of employees assigned from time to time to a specific job or series of projects and a unit with permanent status and function." *Allen*, 846 F. Supp. 2d at 708, citing 29 C.F.R. § 541.103(a). "A recognized department or subdivision may move from place to place and the subordinate personnel may change, as long as the 'unit'

has a continuing functions." *Allen*, 846 F. Supp. 2d at 708, citing *Villegas v. Dependable Const. Servs., Inc.*, 2008 WL 5137321, at *17 (S.D. Tex. Dec. 8, 2008) (citing 29 C.F.R. § 541.103(c), (d)). "Continuity of the same subordinate personnel is not essential to the existence of a recognized unit with a continuing function." *Allen*, 846 F. Supp. 2d at 708, citing 29 C.F.R. § 541.103(d).

As previously noted, a cement crew consists of a cementer, a pump operator, and a bulk truck driver. Exhibit 1, pp. 140. During his employment with Crest, Carley had a single pump operator assigned to his crew – Victor, who was replaced with James following Victor's termination.  Exhibit 1, pp. 145-6. This crew is similar to the ingot line that was found to be a customarily recognized unit in *Brown v. Aleris Specification Alloys, Inc.*, 2016 U.S. Dist. LEXIS 40087 (N.D. Ind. Mar. 28, 2016), where the production supervisor on the ingot line shared some employees with other supervisors while other employees worked only on his line. *Id.* at *19-20; *see also Allen*, 846 F. Supp. 2d at 708 (finding "field service units" had permanent status and a continuing function even where the employees worked on different projects every few days or weeks as part of such units because the employer consistently and continuously relied on its field service units, as supervised by a service supervisor without direct supervision, to perform the customer projects) (citation omitted). The regulations expressly provide that "[a]n otherwise exempt employee will not lose the exemption merely because the employee draws and supervises workers from a pool[.]" *Id.* at *20, citing 29 C.F.R. § 541.103(d). Thus, each cement crew, including the one managed by Carley, constitutes a recognized department or subdivision of the company.

      **2.**      **Carley's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight.**

Carley satisfies the fourth element of the executive exemption because, like other cementers, his suggestions and recommendations as to the hiring, firing, advancement, and promotion of other employees were given particular weight. Crest management sought Carley's input when Crest was making a hiring decision regarding an applicant for a cementer position. Exhibit 1, pp. 193-4. As the highest-ranking employee on and supervisor of the crew, Carley was responsible for observing the crew and ensuring the crew members knew what they were doing and performed their jobs properly. Exhibit 1, p. 215. Carley provided feedback to Crest management on the performance of members of Carley's cement crew, something that Carley did frequently. Exhibit 1, pp. 230-5; Exhibit 2, Exhibits E-L thereto. And, as Carley's co-Plaintiff and co-worker Brandon Brown testified, as a cementer he recommended that Crest hire several employees for cement crews, which Crest did. Rec. Doc. 33, Exhibit 1, pp. 38-9, 44-6, 85-6. Brown also testified that he was hired on the recommendation of another cementer. *Id.*

Under the regulations, "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105. Thus, Carley satisfies the fourth element necessary for application of the executive exemption. *Allen*, 846 F. Supp. 2d at 709-10 (finding the service supervisor satisfied the fourth element for the executive exemption where, among other things, he was the employee who observed performance and with whom his superiors consulted for suggestions and recommendations regarding performance for status changes).

In *Jones v. ENSR Corp.*, 1997 U.S. App. LEXIS 16404 (6th Cir. 1997), the Sixth Circuit found the executive exemption to apply under analogous circumstances. The plaintiff, a field supervisor for a company engaged in the environmental services, performed duties including "supervising and evaluating field technicians, ensuring the safety of the field technicians, training employees regarding safety, participating in the hiring of field technicians, setting and adjusting the hours of field technicians, handling client relations and determining how a project would be completed and the types of materials needed," although he also spent a portion of his time performing physical labor with his crew. *Id.* at *2-3. The plaintiff alleged he was not an executive employee, while the employer argued his duties included the power to hire and fire and the discretion to make decisions for, control and oversee the job site and the crew beneath him. *Id.* at *5. The court found the plaintiff regularly directed two or more other employees based on his testimony that he supervised at least the requisite number of employees. *Id.* The court then determined that the plaintiff's primary duties were managerial and supervisory, as the plaintiff referred to himself as being the "guy in charge" or the "guy responsible for the crew." *Id.* at *8-10. He also admitted he had the responsibility of making sure the job was done on time and within budget, and did any of the necessary administrative paperwork for the site and crew under him, as it was his primary responsibility "to get the job done." *Id.* at *10-11. "In sum, the duties that [the plaintiff] performed indicated that he was a bona fide employee exempt from the requirements of the FLSA that require compensation for overtime; the fact that [the plaintiff] performed labor as well as management duties does not change that conclusion." *Id.* at *13 (citations omitted). Thus, the Sixth Circuit affirmed summary judgment for the employer. *Id.* at *14.

The reasoning and outcome in *Brown v. Aleris Specification Alloys, Inc.*, 2016 U.S. Dist. LEXIS 40087 (N.D. Ind. March 28, 2016), also supports that Carley's most important duties – supervising his crew and overseeing their work for Crest's customers – qualify for the executive exemption. The court considered whether the plaintiff, a production supervisor who was the "boss" on the plant's ingot line and supervised employees working on the line, met the requirements of the executive exemption. *Id*. at *1-2, 24. The court noted that the plaintiff's primary duty was exempt work because he performed most of the duties the regulation described as "management." *Id*. at *14. Among other things, the plaintiff made sure that his crew was "doing what they were supposed to be doing," ensured that production during his shift conformed with an order sheet he received daily from his own supervisors, had "ultimate responsibility" for the number and weight of ingots produced, and kept records related to line production. *Id*. at *2, 14. He was also responsible for ensuring that workers on the line were trained and followed the company's safety policies. *Id*. And, the fact that the plaintiff spent 50% of his time doing manual labor did not change the answer, as the court found there was "no question" the plaintiff's "primary duty was managing the ingot line, not working it." *Id*. at *17. Finally, the plaintiff was responsible for advising upper management about staffing needs. *Id*. at *3. The court found he had sufficient influence over personnel decisions to qualify for the executive exemption. *Id*. at *21-22. Thus, the plaintiff was properly classified as exempt, and the employer's motion for summary judgment was granted. *Id*. at *24.

A Fifth Circuit opinion involving store managers for a convenience store provides further support for the executive exemption in this case. *Lovelady v. Allsup's Convenience Stores, Inc.*, 304 Fed. Appx. 301 (5th Cir. 2008). The district court granted summary judgment in favor of the employer, holding the executive exemption applied to store managers, and the Fifth Circuit

affirmed. *Id*. at 303. The store managers argued they were not exempt because they were required to perform both exempt and non-exempt work, but the court noted that concurrent performance of such work does not disqualify an employee from the executive exemption. *Id*. at 305. Their job duties included training employees, dealing with vendors, disciplining employees, creating work schedules, handling employee grievances, ordering the inventory for their stores, ensuring compliance with the company's policies and procedures, ensuring the accuracy of employee time records, controlling and minimizing expenses, and recommending promotions of clerks to assistant managers. *Id*. While the store managers performed some of the same tasks as non-exempt store clerks, their principal duty was to manage the day-to-day operations of their respective stores. *Id*. And, the store managers customarily and regularly directed the work of two or more other employees. *Id*. Finally, the store managers had the requisite authority to hire and fire or their suggestions were given particular weight, as they testified: (1) they had to obtain final approval, but their hiring recommendations were almost always followed; (2) one store manager testified she fired an employee without seeking authorization from a higher manager; and (3) their recommendations were followed with respect to other personnel matters, such as promotions and raises. *Id*. at 306. Thus, the record established the store managers met the FLSA requirements for exempt employees. *Id*.

The undisputed facts, regulations, and case law demonstrate that Carley satisfies all of the elements of the executive exemption, although the Court need only find that he satisfies one to confirm that he was exempt from overtime under the highly-compensated exemption.

### C.     Carley Was Exempt Under the Motor Carrier Act Employee Exemption.

The FLSA exempts from its overtime requirements "any employee with respect to whom the Secretary of Transportation ("DOT") has power to establish qualifications and maximum hours of service" pursuant to 49 U.S.C. § 31502, the Motor Carrier Act. 29 U.S.C. § 213(b)(1)

(emphasis added); *Vallejo v. Garda CL Southwest, Inc.*, 56 F. Supp. 3d 862, 868 (S.D. Tex. 2014), appeal docketed, 14-20666 (5th Cir. Oct. 30, 2014); *Glanville v. Dupar, Inc.*, 2009 WL 3255292, *3 (S.D. Tex. 2009). The exemption eliminates potential conflicts between the DOL's jurisdiction over the FLSA and the DOT's jurisdiction over the MCA. *Vallejo*, 56 F. Supp. 3d at 868. "An example of potential conflict is the FLSA's requirement to pay overtime hours at one and one-half times the regular pay rate. Encouraging drivers to work overtime hours could undermine safety regulations limiting the number of continuous hours drivers may be on the road." *Id.*, citing *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009); *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947).

The MCA exemption depends upon both the class to which the employer belongs and "the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). The DOT's power of regulation extends to employees, including drivers, driver's helpers, loaders, and mechanics, who engage in or are likely to be called upon to engage in activities "of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id.*

In 2005, Congress enacted the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 114; *Glanville*, 2009 WL 3255292, *4. This amendment limited the DOT's regulatory power to those carriers using commercial motor vehicles, which were defined to have a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater. 49 U.S.C. § 31132(1)(A); *Glanville*, 2009 WL 3255292, *4. In 2008, Congress enacted the SAFETEA-LU Technical Corrections Act of 2008 ("TCA"), Pub. L. No. 110-244, 122 Stat. 1572, which

restored the scope of the DOT's regulatory jurisdiction by eliminating the "commercial" requirement and, thus, the limitation imposed on the DOT's authority based on the weight of the vehicle. *Glanville*, 2009 WL 3255292, *4. At the same time, however, the TCA narrowed the scope of the MCA exemption, separately providing that the overtime provisions of the FLSA shall apply to "a covered employee notwithstanding" the MCA exemption. TCA § 306; *Glanville*, 2009 WL 3255292, *4.

The TCA specifically refers to a "covered employee" as an "individual" whose work "in whole or in part" is "that of a driver, driver's helper, loader or mechanic" and affects "the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce," and "who performs duties on motor vehicles weighing 10,000 pounds or less." TCA § 306(e). The DOL issued Field Assistance Bulletin No. 2010-2 on November 4, 2010, stating that the MCA exemption does not apply "in any workweek" in which the individual's work is as described in the TCA.

The MCA exemption "applies to any employee for whom the Secretary has authority to regulate qualifications and maximum hours of service, regardless of whether the Secretary has exercised that authority." *Vallejo*, 56 F. Supp. 3d at 868, citing 29 U.S.C. § 213(b)(1); *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 678, 67 S. Ct. 931, 91 L. Ed. 1158 (1947); *Barefoot v. Mid-America Dairymen, Inc.*, 16 F.3d 1216, *2 (5th Cir. 1994) (per curiam); *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 229 (2d Cir. 2002). Indeed, courts have gone so far as to note that "any violation of DOT regulations by [the employer] would not affect whether the motor carrier exemption applies." *Glanville*, 2009 WL 3255292, *8, citing *Levinson*, 330 U.S. at 661 ("the Commission's mere possession of that power, whether exercised or not, necessarily excluded all employees, with respect to whom the power existed, from the benefits of the

compulsory overtime provisions" of the FLSA); *Barefoot*, 1994 WL 57686 at *2 ("The Secretary [] need only possess the power to regulate the employees at issue; it need not actually exercise that power" for the motor carrier exemption to apply); *Bilyou*, 300 F.3d at 229 (rejecting the argument that an employer's failure to comply with DOT regulations, "including requirements relating to registration, operating authorization, and logging driver hours" estopped employer from arguing it was subject to Secretary of Transportation's authority). "The question is not whether [the employer] intended to be governed by the Department of Transportation or is in fact in compliance with Department of Transportation regulations, but rather whether [the employer's] activities fall within the motor carrier practices over which the Department of Transportation has power and authority." *Glanville*, 2009 WL 3255292, *8, citing *Collins v. Heritage Wine Cellars, Ltd.*, 2008 U.S. Dist. LEXIS 104555, 2008 WL 5423550, at *9 n.5 (N.D. Ill. Dec. 29, 2008) (finding "unpersuasive" the contention that the defendants' failure to register with the DOT was subjective evidence that the defendants themselves did not believe the exemption at issue was applicable and granting summary judgment in the defendants' favor on the MCA exemption), *affirmed*, 589 F.3d 895 (7th Cir. 2009).

With that framework in mind, there can be no question that the MCA exemption applies to Carley for his work as a cementer with Crest because: (1) he was employed by a carrier whose transportation of passengers or property by motor vehicle is subject to the Secretary's jurisdiction under the MCA; and (2) he engaged in activities of a character that affected transportation safety and that involved the transportation on the public highways of passengers or property in interstate commerce within the meaning of the MCA.

First, Crest is a motor vehicle carrier subject to the Secretary's jurisdiction. The MCA exemption applies to drivers employed by a "motor carrier." *Glanville*, 2009 WL 3255292, *4. A

"motor carrier," which is defined as "a person providing commercial motor vehicle … transportation for compensation," 49 U.S.C. § 13102(14), may engage in interstate commerce either by "actually transporting goods across state lines or (by) transporting within a single state goods that are in the flow of interstate commerce." *Barefoot,* 1994 WL 57686, at *2 (citations omitted). The evidence is undisputed that Crest is a motor carrier regulated by the U.S. Department of Transportation ("DOT") operating under USDOT Number 2264972, and has been a registered motor carrier since 2012. Exhibit 2, ¶ 5. Additionally, Crest actually participated in interstate commerce during the time period at issue in this case as Crest performed work at customer job sites in New Mexico using cement crews based out of Sweetwater, Texas. Exhibit 2, ¶ 19.  Moreover, it is undisputed that Carley operated a Ford 350 during his employment with Crest, a vehicle with a gross vehicle weight rating of more than 10,000 pounds. Exhibit 1, pp. 100-1, 188-9; Exhibit 2, ¶ 15, and Exhibit D thereto. Thus, Crest qualifies as a motor carrier subject to the jurisdiction of the DOT.

Second, there can be no genuine dispute that Carley engaged in the types of activities covered by the MCA exemption. Carley, who had a commercial driver's license, regularly pulled either a boost trailer or an air trailer with his Ford 350 for jobs at Crest. Exhibit 1, pp. 153-4. Indeed, Carley, as the cementer, would transport the cement head, a piece of equipment that connects to the well casing for pumping operations and that are different sizes and heavy, in the back of his truck. Exhibit 1, pp. 154-5. These driving activities were an important part of his duties because the work could not take place if the personnel and equipment were not transported to the project site. *Allen*, 846 F. Supp. 2d at 697. Thus, Carley satisfied the safety-affecting duties aspect of the definition of "partial-duty drivers" in the DOL regulations. *Id*. at 699, citing 29 C.F.R. § 782.3; *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 471 (5th Cir. 2010) (citing *Barefoot v.*

*Mid-America Dairymen, Inc.*, 826 F. Supp. 1046, 1050 (N.D. Tex. 1993), *aff'd*, 16 F.3d 1216 (5th Cir. 1994)).

Moreover, there can be no dispute that Carley could be "reasonably expected" to engage or to be asked to engage in safety-affecting duties in connection with interstate transport of property "in the ordinary course of his work," at least "from time to time." *Allen*, 846 F. Supp. 2d at 702, citing *Songer*, 618 F.3d at 474; 29 C.F.R. § 782.2(b)(3). For the purpose of the MCA exemption, a carrier engages in interstate commerce by either actually transporting goods across state lines or transporting within a single state goods that are in the flow of interstate commerce. While Carley testified that he did not perform any jobs outside of Texas in the short sixteen weeks he was employed by Crest, it is undisputed that Crest's cement crews based out of Sweetwater, Texas, like Carley's, traveled to New Mexico to perform jobs for customers with operations there. Exhibit 1, p. 156; Exhibit 2, ¶ 19; *see also* Rec. Doc. 33, Exhibit 1, pp. 77-8; Exhibit 3, ¶ 18. Thus, the character of the duties performed by Carley demonstrate that the DOT had jurisdiction to regulate him, and the exemption therefore applies.

Finally, the TCA exception does not apply because Carley did not perform his duties with a vehicle weighing 10,000 pounds or less. "To be entitled to overtime pay, an employee must perform some meaningful work for more than an insubstantial time with vehicles weighing 10,000 pounds or less." *Allen*, 846 F. Supp. 2d at 705. The undisputed evidence reflects that Carley was assigned a 2014 Ford 350, which has a gross vehicle weight rating of 11,500 pounds. Exhibit 2, ¶ 15. Thus, the TCA exception does not apply, and Carley is exempt under the MCA employee exemption.

## V.   <u>CONCLUSION</u>

For the reasons addressed herein, Carley's claims should be dismissed, with prejudice and at his cost.

Respectfully submitted,

*/s/ Jennifer L. Anderson*
Jennifer L. Anderson
Attorney-In-Charge
(TX Bar No. 24047796; Federal ID 34754)
Stephanie M. Gilliam
(TX Bar No. 24083071; Federal ID 1829598)
Jones Walker LLP
Four United Plaza
8555 United Plaza Boulevard
Baton Rouge, Louisiana 70809
Telephone: (225) 248-2040
Facsimile: (225) 248-3040
E-mail:janderson@joneswalker.com
          sgilliam@joneswalker.com

and

Christopher S. Mann
(TX Bar No. 24061563; Federal ID 605320)
Jason Culotta (Federal ID 2859054)
Jones Walker LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8332
Facsimile:  (504) 589-8332
E-Mail:cmann@joneswalker.com
          jculotta@joneswalker.com

**Attorneys for Defendant, Crest Pumping Technologies, LLC**

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2016, a copy of the foregoing was filed electronically using the Court's CM/ECF system and served in accordance with the Federal Rules of Civil Procedure. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.

*/s/ Jennifer L. Anderson*
Jennifer L. Anderson