Page 1

```
 1              UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
 2                   MIDLAND DIVISION
 3   SCOT CARLEY, ON BEHALF OF      *
     HIMSELF AND ALL OTHERS         *
 4   SIMILARLY SITUATED             *
                                    *
 5            Plaintiff,            *
                                    *
 6   VS.                            *  NO. MO:15-CV-00161-RAJ-DC
                                    *
 7   CREST PUMPING TECHNOLOGIES,    *
     LLC,                           *
 8                                  *
              Defendant.            *
 9

10

11   *********************************************************
12          ORAL DEPOSITION OF SCOT CARLEY
13              Taken April 8, 2016
14   *********************************************************
15              ORAL DEPOSITION of SCOT CARLEY, produced
16   as a witness at the instance of the Defendant, and duly
17   sworn, was taken in the above-styled and numbered cause
18   on Friday, April 8, 2016, from 9:12 a.m. to 3:18 p.m.,
19   in the offices of Permian Court Reporters at 605 West
20   Texas, Midland, Texas, before Stephanie J. Blair,
21   Certified Shorthand Reporter Number 6819 in and for the
22   State of Texas, pursuant to the Texas rules of Civil
23   Procedure (and the provisions stated on the record or
24   attached therein).
25
```

**EXHIBIT**

**1**

```
 1                     A P P E A R A N C E S
 2     For the Plaintiff:
 3          Mr. Collin Wynne
            The Young Law Firm
 4          1001 South Harrison
            Amarillo, Texas 79101
 5          (806) 331-1800
            collin@youngfirm.com
 6
 7     For the Defendant:
 8          Mr. Christopher S. Mann
            Jones Walker, LLP
 9          201 St. Charles Avenue
            New Orleans, Louisiana 70170
10          (504) 582-8332
            cmann@joneswalker.com
11
            Ms. Jennifer L. Anderson
12          Jones Walker, LLP
            Four United Plaza
13          8555 United Plaza Boulevard
            Baton Rouge, Louisiana 70809
14          (225) 248-2040
            janderson@joneswalker.com
15
16     Also Present:   Kevin Dennis
17
18
19
20
21
22
23
24
25
```

Electronically signed by Stephanie Blair (001-351-611-7450)          fdeb2873-86cf-4319-bf3a-b8447d324e37

```
 1                      I N D E X
 2   Witness:                                        Page
 3   SCOT CARLEY
 4        Examination by Mr. Mann                       4
          Examination by Mr. Wynne                    252
 5
          Reporter's Certificate                     256
 6
 7                    E X H I B I T S
 8   1   Application for employment                   75
     2   2014 W-2                                      86
 9   3   Employee status change form 2/18/14      89
     4   Employee warning notice 5/29/14            105
10   5   Employee status change form 6/10/14     122
     6   Cement job log 3/16/14                      184
11   7   Morning tailgate meeting agenda            199
     8   Cement job log 3/14/14                      201
12   9   Cement job log 3/23/14                      206
     10  E-mail string                               207
13   11  Cement job log 4/4/14                       211
     12  E-mail                                      224
14   13  E-mail string                               227
     14  E-mail                                      229
15   15  E-mail                                      230
     16  E-mail string                               233
16   17  E-mail                                      235
     18  E-mail                                      237
17   19  E-mail                                      238
18
19
20
21
22
23
24
25
```

Electronically signed by Stephanie Blair (001-351-611-7450)                fdeb2873-86cf-4319-bf3a-b8447d324e37

```
 1                    SCOT CARLEY,
 2   having been first duly sworn by the Certified Court
 3   Reporter, testified as follows:
 4                    EXAMINATION
 5   BY MR. MANN:
 6        Q.   Good morning, Mr. Carley.  My name is
 7   Christopher Mann.  I'm an attorney representing Crest
 8   Pumping Technologies in the lawsuit that you've filed
 9   against them, and we're here today to take your
10   deposition.  You understand that's why we're here to
11   take your deposition in regard to the lawsuit you filed?
12        A.   Yes, sir.
13        Q.   Have you ever given a deposition before?
14        A.   No, sir.
15        Q.   I'm sure your attorney has advised you about
16   this process, but I'm just going to go over a couple of
17   things with you to make this goes as smoothly as
18   possible.  In general this is just a question and answer
19   session.  It's an opportunity for me to ask questions to
20   you to which you hopefully you'll be able to provide me
21   with answers, and for that process to go as smoothly as
22   possible, it's important we do is a couple of things.
23             First, the woman to your left is the
24   court reporter.  She's taking down everything that takes
25   place today and she's typing it up, and in a couple of
```

1    Q.    Okay.  Do you have a CDL?

2    A.    I had one.

3    Q.    Had one.

4    A.    Uh-huh.

5    Q.    Okay.  You no longer --

6    A.    No.

7    Q.    -- have one?

8          When did it expire to the best of your

9    recollection?

10    A.    2015.

11    Q.    Okay.  Do you remember when you first got a

12    CDL?

13    A.    2011.  I believe it was like April, something

14    like that.

15    Q.    Do you --

16    A.    Doesn't have the issue date.

17    Q.    That's fine.  Do you remember who you were

18    working for at the time when you got the CDL?

19    A.    Basic Energy.

20    Q.    Are you married?

21    A.    No, sir.

22    Q.    Have you ever been married?

23    A.    Yes, sir.

24    Q.    Okay.  How long have you not been married

25    approximately?

Electronically signed by Stephanie Blair (001-351-611-7450)        fdeb2873-86cf-4319-bf3a-b8447d324e37

Page 36

1      Q.    And then at Crest you said a QAQC as well.
2   Correct?

3      A.    Correct.

4      Q.    When I was asking you about what you -- your
5   job as a bulky, you said keep your ears open, eyes open
6   and keep your mouth shut.  Right?

7      A.    Pretty much, yes, sir.

8      Q.    Who were you taking direction from as a bulky
9   at Basic?

10     A.    Everybody that had more experience than me.

11     Q.    Okay.  Well, that would be -- the way you
12  describe it, that would be everyone at Basic.  Right?

13     A.    Absolutely.

14     Q.    Would you be taking direction from pump
15  operators?

16     A.    Yes, sir.

17     Q.    Would you be taking direction from the
18  cementer?

19     A.    Yes, sir.

20     Q.    From the field supervisor -- would you be
21  taking direction from the field supervisor?

22     A.    Yes, sir.

23     Q.    All right.  To your knowledge while you were
24  at Basic was there a hierarchy on a cement crew as far
25  as who was, you know, at the top and who was at the

Page 37

1   bottom?

2                    MR. WYNNE:  Objection, form.

3        A.    Just really based off experience and -- and

4   job function.

5        Q.   (BY MR. MANN)  Okay.  Let's talk about from

6   the job function standpoint.

7        A.    Uh-huh.  Okay.

8        Q.    At -- while you were at Basic --

9        A.    Uh-huh.

10       Q.    -- what was the hierarchy based on job

11  function on the cement crew?

12                   MR. WYNNE:  Objection, form.

13       A.    I would -- I'm really trying not to elaborate

14  too much to make it too difficult, but the smaller jobs

15  like a surface job or a plugging in, squeezing or

16  running a line or, you know, anything like that, you

17  don't have a field supervisor on it.  It would be a

18  cementer, pump operator and then the drivers that drive

19  the bulk trucks.  When you're doing bigger jobs like --

20  not as often an intermediate, but two stage and

21  production jobs, you'll have a field supervisor out

22  there or a QAQC guy from Crest, and it would go QAQC,

23  field supervisor, cementer, pump operator, drivers,

24  bulkies --

25       Q.    Okay.

SCOT CARLEY

Page 84

1      A.    It was.

2      Q.    Was there anyone else that was part of the

3    interview?

4      A.    No.   I think one or two of the coordinators

5    may have stepped in and out when I was in there, but

6    that was it.

7      Q.    For the most -- but primarily it was you

8    interviewing with Patrick.

9      A.    Yes, sir.

10      Q.    How long roughly did that interview last?

11      A.    I would venture to guess probably no more than

12    30 minutes.

13      Q.    Were you offered a position during that

14    interview?

15      A.    I was told, if I remember correctly, he had to

16    do -- they had to do a background check and maybe check

17    references -- but I specifically remember background

18    check -- and that if the -- and then I would hear

19    something back from him.   And so I went back to -- came

20    back to Midland, and I think it was within two, three

21    days maybe he called me and offered me a job.

22      Q.    When you got the call offering you the job as

23    you described it, what job were you offered?

24      A.    A cementer.

25      Q.    And what was the compensation that you were

Page 85

1   offered?

2        A.   90,000 salary.

3        Q.   Was there any sort of additional compensation

4   besides a salary that you were offered?

5        A.   Yeah, we talked about it.

6        Q.   Okay.  What did you talk about?

7        A.   He said, "Every job that you complete, you get

8   a $200 job bonus."

9        Q.   Okay.  Other than the $200 job bonus, was

10  there any other compensation that you discussed with

11  Mr. Helgerson --

12       A.   No, sir.

13       Q.   -- with Patrick?

14       A.   That was it in a nutshell:  90,000 salary,

15  plus your job bonuses.

16            And as a matter of fact -- let me just go

17  ahead and add to that -- I was told by the man sitting

18  across the table, not individually but in a group of

19  people during a meeting after we'd already started our

20  employment, that cementers should make $140,000 a year

21  working at Crest.  Kevin Dennis made that statement --

22       Q.   Okay.  Right.

23       A.   -- in the shop during an employee meeting.

24       Q.   Okay.  But at any point were you guaranteed

25  $140,000 in salary?

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

1      A.    No, it wasn't 140,000 salary.   It was $90,000

2    in salary.   With your job bonuses, you should make

3    140- -- the exact statement was, "You should make

4    $140,000 a year as a cementer working for Crest," based

5    on the amount of business and how things were going.

6      Q.    You did not work a full year for Crest.

7    Correct?

8      A.    No, I did not.

9      Q.    Do you have any records of your own of the

10    amount of money you earned while working at Crest?

11      A.    Other than -- no, I don't have a W-2 on me or

12    anything like that.   I'm sure you've got one or you

13    wouldn't be asking.

14      Q.    Interesting you say that.

15      A.    You're pretty transparent with that.

16      Q.    As I told you, I'm not going to try to trick

17    you --

18      A.    Thank you.

19      Q.    -- in any way.

20      A.    I appreciate that.

21      Q.    Let me show you a document I will mark as

22    Exhibit Number 2.

23                  (Exhibit 2 marked.)

24      A.    That tells me how much money I made when I was

25    there.

Page 87

1      Q.    (BY MR. MANN)   Ask if you recognize this

2   document.

3      A.    I've seen this.   I've seen the original -- or

4   my copy before.

5      Q.    Right.   This is a copy of a W-2 issued to you

6   from Crest.   Correct?

7      A.    Yes.   Yes.

8      Q.    In 2014.   Correct?

9      A.    Yes.

10     Q.    Okay.   Do you have any reason to dispute the

11  accuracy of this W-2 as far as the earnings you received

12  while working at Crest?

13     A.    I would just ask you does that include salary

14  and bonuses?

15     Q.    My question is do you have any reason to

16  dis- -- do you have any records or any reason to dispute

17  that the compensation that's reflected in Exhibit Number

18  2 as being the compensation you received from Crest?

19     A.    I can't answer that fairly without sitting

20  down with a calculator and doing the math myself.

21     Q.    Okay.   Do you think that you earned more or

22  less while working at Crest than what's reflected on

23  Exhibit Number 2?

24          MR. WYNNE:   Objection, form.

25     A.    To be honest with you, I -- what my statement

SCOT CARLEY

1    is is I don't know if that includes bonuses with the

2    salary or if that's just salary because -- the reason

3    that I'm saying that is because they were paid

4    separately, your salary and your bonuses.  You only got

5    bonuses once a month where you got your salary biweekly.

6    So my statement would be if this includes salary and

7    bonuses, then I believe it's accurate in what I was

8    paid.

9         Q.    (BY MR. MANN)  Understood.  You told me a

10   moment ago that -- you said a couple of days after your

11   interview with Patrick, you got a call from him,

12   correct, offering you the cementer position?

13        A.    Roughly a couple of days, yeah.

14        Q.    Do you remember when you -- how soon after

15   your interview that you first actually started working

16   for Crest?

17        A.    I don't remember ex- -- I know the start date

18   was at the beginning of February, but I -- if I remember

19   correctly, it was a couple of weeks I was supposed to

20   start after that.

21        Q.    Okay.  Well, let's look --

22        A.    Within a couple of weeks.

23        Q.    Sure.  We looked at Exhibit 1, recall, and

24   there was a -- showed that you filled out the

25   application, at the top it says, February 11th.  Is that

1    right?

2        A.    Well, maybe it was.  Yeah.

3        Q.    Okay.  Let me show you --

4        A.    The start date.

5        Q.    -- another document, which I'll mark as

6    Exhibit 3.

7                    (Exhibit 3 marked.)

8        A.    Do I get the highlighted one?

9              You're supposed to say "yes" or "no"

10   instead of shaking your head.

11                    MR. MANN:  And for the record Exhibit

12   Number 2 was previously marked and produced as D-CAR-1.

13       Q.    (BY MR. MANN)  I'm handing you, Mr. Carley, an

14   exhibit which I've marked as Exhibit Number 3.  It's

15   been previously produced as D-CAR 77.

16       A.    Okay.  So it was a week.

17       Q.    Have you -- recall seeing this document

18   before, Mr. Carley?

19       A.    No, I don't recall seeing this.

20       Q.    Okay.

21       A.    That doesn't mean that I didn't.  I just don't

22   recall.

23       Q.    I appreciate that.

24              I'll represent to you this is another

25   document that Crest has produced out of your personnel

1    file.  Would you have any reason to dispute any of the

2    information?

3         A.   I don't -- let me --

4              MR. WYNNE:  Objection, form.

5         A.   It's got the rate 90K salary, cementer, new

6    hire, full time, salary, employee items to be issued.

7    No, I don't see any reason to -- I mean that all looks

8    pretty accurate.

9         Q.   (BY MR. MANN)  Okay.  And Exhibit Number 3

10   shows -- at the very top right shows a hire date of

11   February 18, 2014.  Correct?

12        A.   Okay.

13        Q.   All right.  Let's move toward a section you

14   actually referenced.  It says:  Items to be issued.

15             Do you see that?

16        A.   Yes.

17        Q.   Okay.  Were you issued certain items --

18   certain equipment as part of your employment with

19   Crest?

20        A.   I was.

21        Q.   All right.  Let's go over those.  The first

22   one I see checked is uniforms.  Were you -- were you

23   issued any uniforms?

24        A.   We were.

25        Q.   Okay.  What type of uniforms?

```
 1        A.    We had a coat and then FRCs, coveralls.

 2        Q.    FRC meaning fire retardant?

 3        A.    Uh-huh.

 4        Q.    That's a yes?

 5        A.    Yes.  Sorry.  It's a bad habit.

 6        Q.    You're doing fine.  The next item that's

 7  marked off, it says:  Computer laptop.

 8              Do you see that?

 9        A.    Correct.

10        Q.    Were you issued a laptop?

11        A.    Along with every other cementer, yes.

12        Q.    Okay.  Do you recall what type of laptop as

13  far as brand?

14        A.    No.  I'm sure you have that information,

15  though.

16        Q.    Did you -- during your employment with Crest

17  did you have the same laptop the whole time, or did you

18  have more than one?

19        A.    You know, I believe I had the same one.

20        Q.    Okay.

21        A.    I mean I think a couple of other guys had

22  problems with their laptops that got hired at the same

23  time, and maybe one had to change.  I remember that

24  coming up, but I think I had the same one.

25        Q.    The next item marked off is hard hat.  I
```

SCOT CARLEY

1  assume you were issued a hard hat.  Right?

2      A.  Yes.

3      Q.  And it has the Crest logo I assume.

4      A.  Sure.

5      Q.  Right?

6              The next item marked off is credit card.

7  Were you issued a credit card --

8      A.  Yes.

9      Q.  -- by Crest?

10     A.  Yes.

11     Q.  One or more than one?

12     A.  Just one.

13     Q.  Okay.  What was that credit card -- what did

14  you use that credit card for?

15     A.  If we couldn't get fuel at the yard -- which,

16  you know, they had a fuel tank at the yard that you're

17  supposed to use, but I mean if you're out -- which you

18  were quite frequently.  You're out more than two, three,

19  four days.  You know, you might be 300 miles away from

20  the yard.  You can't come back and get fuel so -- you

21  might be in a small town -- Small Town, Texas, and you

22  may have to fuel up your pump or your pickup.

23              If we were out more than 24 hours, you

24  could feed -- feed the crew, you know, and/or feed

25  your- -- and yourself, but there was a dollar limit on

Page 98

1      Q.    Going back to Exhibit 3, the next item that's
2  checked off as an item that was issued is the cell
3  phone.
4      A.    Uh-huh.
5      Q.    That's a yes?
6      A.    Yes.  Sorry.
7      Q.    And we talked earlier that Crest issued you a
8  cell phone.  Right?
9      A.    They did, yes.
10      Q.    Do you recall what type of phone as far as a
11  Samsung, iPhone?
12      A.    I believe it was an iPhone.
13      Q.    And what did you use that cell phone for?
14      A.    Wow.  I mean communication.  I mean
15  communication back and forth between drivers when you're
16  on jobs, calling your pump operator, calling
17  coordinators, calling Patrick, using it for the map
18  functions on it, trying to find directions, you know.
19  Sometimes, you know, on where you're going.  I mean you
20  name it.  I mean that would that would pretty much be
21  it.
22      Q.    Did you use that cell phone -- or did that
23  cell phone have text capability?
24      A.    Sure.
25      Q.    Did you use your Crest cell phone to text

1   fine -- QAQC guys and supervisors to let them know that

2   the equipment functions fine or that the job went well,

3   but I can't remember if it was a text message or an

4   e-mail to be honest with you.

5       Q.   Okay.   The next item that's listed on Exhibit

6   Number 3 is something that was issued to you.   It says

7   company vehicle.

8       A.   Yes, sir.

9       Q.   Were you issued a company vehicle?

10      A.   I was.

11      Q.   What type of company vehicle?

12      A.   It was a Ford.   I believe it was an F-250.   I

13  don't know if you call it the king cab or whatever --

14  the four-door four-wheel drive.

15      Q.   During your employment with Crest, did you

16  have the same vehicle the whole time, or did you have

17  more than one vehicle?

18      A.   Same one.

19      Q.   You said it was an F-250.

20      A.   If I remember correctly, yes.

21      Q.   The next item that's checked says -- well,

22  actually let me ask about the vehicle first.   On your --

23  when you weren't working on your days off, were you

24  still using -- were you allowed to use that vehicle?

25      A.   To elaborate on your question, no, you're not

Page 101

1    supposed to use it on your days off, but virtually

2    everybody that had a company truck that was working out

3    of that yard had to commute, you know, to go back home.

4    For instance, me, from Sweetwater to Midland while I

5    was -- while I was living here up until the very end.

6         Q.   So if I understand you right, you were allowed

7    to use your company vehicle to commute from home -- to

8    and from home to the yard.

9         A.   Yeah.  I mean you don't go to the movies in

10   your truck, but I mean like me on my -- when I would be

11   on the way back from work, I might stop at Wal-Mart

12   because I have to go in and get staples and a couple of

13   pens and stuff like that, you know, to be able -- not

14   staples -- paper clips and pens and stuff like that that

15   I would call like office supplies.  Oh, you could

16   purchase those on the company card by the way.

17        Q.   Okay.

18        A.   You know, like paper clips and, you know, pens

19   and stuff like that.  Or if you've got to drive your

20   truck through the car wash, you know, if you want to do

21   that and pay for it.  If you wanted to pay for it

22   yourself, you know, you could do that, which I

23   personally did that because I liked a clean truck.  That

24   would be something else that I didn't remember until

25   just now, but other than just that normal running

Page 110

1  following that conversation you just described to me

2  having with Patrick, did you receive any sort of

3  discipline?

4      A.    No.

5      Q.    Do you recall when your em- -- date your

6  employment with Crest ended?

7      A.    Not the exact date, but I know it was the

8  beginning of June if I remember correctly.

9      Q.    Do you -- what were the circumstances of your

10  employment ending at Crest?

11      A.    Doesn't have that on the status change.  To

12  put it simply, I was in the process of -- and I had had

13  this conversation with Patrick actually over a period of

14  about six weeks, that I was wanting to move from Midland

15  closer to Lubbock because my ex-wife had moved to

16  Lubbock and she'd remarried and that's where my daughter

17  was, and so I didn't want to drive to Midland on -- most

18  of the time, you know, when you're hired, you're told

19  that you're going to work a six and three schedule, but

20  most of the time you work seven and two.  And so in my

21  short period of time off, I didn't want to have to drive

22  to Midland and then turn around and drive to Lubbock

23  just to go see my daughter.

24              And so Patrick and I on probably five or

25  six different occasions discussed -- he said, "Have you

SCOT CARLEY

Page 123

1      A.    No, it's pretty close.

2      Q.    -- the last day of your employment?

3            Okay.  Thank you.

4      A.    Is that all you want on this one?

5      Q.    Uh-huh.

6      A.    Okay.

7      Q.    Your work as a cementer at Crest, did it

8  differ in any significant way from the cementer work you

9  had done at any of your prior employers?

10      A.    I would say in a few ways.  I think that --

11  and to give Crest credit, I think that Crest was more

12  professional in the way that they expected us to perform

13  our duties.  You're not just oil field trash out there

14  slinging cement around.  There was a lot more paperwork.

15  That's not to say that it took hours to do it, but there

16  was a lot more paperwork to do and like charting for

17  jobs.  I didn't have to do that at other companies or

18  they had just started and I'd only done it a few times,

19  but it was required on all of our jobs.

20            But, no, I mean I did more bigger jobs at

21  Crest than I did at Basic or Shack but, again, that's

22  strictly due to the amount of volume that they had.

23  They were growing like a weed on MiracleGro.  You know,

24  I mean they were doing really good, you know, so they

25  were getting a lot of bigger jobs.  And so I mean other

SCOT CARLEY

Page 127

1      A.    The cementer.

2      Q.    Thank you.

3      A.    The coordinator tells you, "Okay.  This
4   proposal's not going to be right," okay, because -- it
5   could be a number of things.  It could be the amount of
6   miles that you're driving, you have to add a piece of
7   equipment or take a piece of equipment off or there's a
8   cost for this chemical and it's changed, you know, from
9   when this proposal was done a month ago or two months
10  ago or whatever.  So you're the one that's going to have
11  to make the changes on this.  Okay.  Coordinator tells
12  you that.

13            When you turn in your paperwork for the
14  job that was completed, you know -- which is your job
15  narrative, JSAs, your tickets, your charts -- and
16  everything is turned in, then this all goes to the
17  coordinator, and coordinator has to go through it with a
18  fine-tooth comb and make sure that it's done correctly.
19  Okay.  Well, since we've never figured out the chemicals
20  and the cost of the chemicals, well, then the
21  coordinator -- which most of the time for me was David
22  Burges -- says, "This is how much -- this is how I want
23  you to charge for this," whether it be ton mileage or
24  how much chemical costs.  Okay.  Fine.  If something's
25  wrong on that ticket -- if David Burges has to correct

SCOT CARLEY

Page 140

1      A.    True.

2      Q.    A cementer is on every cement job.  Correct?

3      A.    True.

4      Q.    A pump operator is on every cement job.

5  Correct?

6      A.    True.

7      Q.    At least a bulk driver, bulky, is part of any

8  cement job.  Right?

9      A.    True.

10      Q.    And there could be more than one bulk driver

11  depending on the job.

12      A.    True.

13      Q.    There's paperwork associated with any cement

14  job, correct, that you had to deal with as a cementer?

15  Correct?

16      A.    True.

17      Q.    I'm going to ask a very broad question and

18  then we'll eventually be able to hopefully narrow it

19  down.  I want you to walk me through that when you were

20  at Crest from the time you would first get word that

21  there's a job to do up until the end of the job just in

22  general, can you walk me through that process.

23            MR. WYNNE:  Objection, form.

24      A.    Called out by dispatch.  Then you have to show

25  up at the yard, have to make sure all your drivers are

SCOT CARLEY

Page 141

1    in the right equipment based off of -- make sure you're

2    taking the right load because there were multiple jobs

3    going on and so you don't want to take the wrong

4    equipment or the wrong cement to the wrong job.  And

5    then before you leave the job, you have to do a little

6    JSA with your -- with the guys that are going to the job

7    with you.  You get all -- like I said, you get all the

8    pertinent equipment to take to the job.  You drive to

9    the job.  You arrive on location.  You see where the

10   rig's at in their operations.  You get what equipment

11   you can get spotted in and placed where you need --

12   where it needs to be.  You rig up.  Like you can rig up

13   based off of what rig operations are going on at the

14   time.

15              You have to make contact with company man

16   to get pertinent well information from him:  name,

17   numbers, size of the casing that you're pumping through.

18   Verify with him how much cement you've got versus what

19   he's been told by his engineers that you're bringing.

20   You got to test water and, again, you know, leaving out

21   where the rig's at, you know, in their operations

22   because they could have pipe racks in the way and you

23   can't get all your equipment in right now.  You know,

24   they could still be running pipe downhole.

25              Getting all that out of the way, you rig

SCOT CARLEY

1    up all your equipment and rig it up to the well head, do

2    a pressure test.  After you do a pressure test, you

3    verify that you've got good circulation in the hole by

4    pumping water into it, and that's usually an amount

5    that's predetermined by the company man, how much he

6    wants you to pump ahead first.

7              And once you verify you've got a good

8    circulation, then you go to your cement -- your lead and

9    your tail cement just as a standard.  Sometimes there's

10   stuff that you pump ahead of the cement, but that would

11   be for different jobs.  Go through your lead and your

12   tail cement.  Then you drop your plug, wash up your

13   pump, displace a plug down to the float where it needs

14   to be, land the plug, pressure up on it and make sure

15   that it's holding.

16             Once you do that, you verify that it's

17   holding.  You let the company man know.  He gives you

18   the okay.  You release -- you release the pressure off

19   of it.  Then he okays you to rig down.  Then you go to

20   the rig floor, and you just do everything that you did

21   at the beginning in reverse.  Rig up from the well head,

22   back down to the floor -- or to the ground rather and

23   back to the equipment, and you put all your equipment

24   back on the trucks.  Cementer, you do your report and

25   job ticket and get your charts together, turn that into

Page 143

1    the company man.  He releases from you from location.

2                      Leave location.  You get off location and

3    you -- cementer and the pump operator clean the pump up,

4    get all the cement out of it.  And then most of the time

5    you're going to another one, and you're finding out

6    where you got to send the bulkies -- you know, bulk

7    drivers, whether you got to send them to the yard and

8    get more cement.  Then they get dispatched someplace

9    else.  Then you've got to send out -- like I said, the

10   cementer at Crest -- again, I can't remember if it's a

11   text or an e-mail, but then you got to send out that

12   follow up to where all the other cementers and

13   supervisors -- you know, field supervisors and QAQC

14   managers know how the job went.

15        Q.   And then you start the process over for the

16   next job.

17        A.   Pretty much.

18        Q.   Okay.  I want to talk about the part of the

19   job from the time of notice up through the time that

20   you're still at the yard.

21        A.   Okay.

22        Q.   Okay.  How would you receive notice of a

23   job?

24        A.   Phone call.

25        Q.   On your company phone?

1          A.    No, sir.

2          Q.    Did you know who did that?

3          A.    Dispatch.

4          Q.    While at Crest did you work with only one pump

5    operator or more than one?

6          A.    More than one.

7          Q.    Was there one that you worked with more often

8    than not?

9          A.    I think it was -- no, it was two separate.  I

10   had one when I first started, and then I can't remember

11   if he got fired or if he quit, one of the two, because

12   he was -- I know he was violating company policy because

13   he wouldn't put his coveralls on when he got on location

14   and, you know, he was supposed to have them on when

15   you're on rig location.  He had done that with another

16   cementer.  And so I can't remember if he -- I know that

17   he got talked to or written up or something.  He got mad

18   and he quit or they let him go, one of the two, and he

19   went back to OTEX (phonetic).  And then they gave me --

20   assigned me another one.

21         Q.    The first pump operator you were telling me

22   about, remember his name?

23         A.    I think it was Victor if I remember correctly.

24   I could be wrong.

25         Q.    And do you remember Victor's last name?

Electronically signed by Stephanie Blair (001-351-611-7450)          fdeb2873-86cf-4319-bf3a-b8447d324e37

Page 146

```
 1        A.   No.
 2        Q.   Okay.   The second pump operator that you were
 3   assigned --
 4        A.   I believe his name was James.
 5        Q.   Victor, you said, who -- I think you said had
 6   been violating company policy by not putting on his
 7   coveralls.  Right?
 8        A.   When he was with somebody else, he had done
 9   that, yeah.
10        Q.   Okay.   I guess you anticipated my question.
11   Did -- while Victor worked with -- was the pump operator
12   working with you, did he ever violate any company policy
13   that you witnessed?
14        A.   No.
15        Q.   Did you ever have a chance or the need to
16   report any sort of infraction, discipline violation of
17   policy, what have you, about Victor?
18             MR. WYNNE:  Objection, form.
19        A.   No.
20        Q.   (BY MR. MANN)  What about James, did you --
21   while he was working with -- as your pump operator, did
22   you ever have any reason to discipline or report
23   anything -- any problems with James?
24        A.   Yes.
25             MR. WYNNE:  Objection, form.
```

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

Page 147

1      A.    I reported something.

2      Q.    (BY MR. MANN)   What was that what you

3  reported?

4      A.    I would -- I don't know if you'd call it

5  insubordination, but I told him to do something and he

6  didn't do it that directly involved the pump.

7      Q.    And who did you report that to?

8      A.    Patrick.

9      Q.    And why?  Why did you feel the need to report

10 that to Patrick?

11     A.    Well, Patrick was the manager so, of course,

12 you wouldn't go to dispatch or a coordinator about it.

13 And it was because we had left a job, and he -- I told

14 him to pull a pump off onto another location and to wait

15 for me to come over there.  And actually he did this

16 probably three or four times, and this is why I reported

17 it to Patrick.  And -- and I said -- excuse me.  Let me

18 back up.  I said it to Shawn first on the phone, and

19 then when I got back, I had to talk to Patrick about it.

20                And what he had done is he had not

21 blasted off the pump thoroughly and cleaned it up and so

22 in effect there was dry cement or cement left in the

23 pump that dried up.

24     Q.    Did you -- you said that had happened several

25 times before with James before you reported it.

1    in there and it can cause a host of other problems.

2        Q.   (BY MR. MANN)   My question, though, was as a

3    cementer --

4        A.   Uh-huh.

5        Q.   -- did you believe that part of your job was

6    that if your pump operator was doing something that you

7    thought was in improper, that you needed to address it

8    with the pump operator?

9             MR. WYNNE:   Objection, form.

10       A.   If he didn't do something that I asked, yes --

11   asked him to do.

12       Q.   (BY MR. MANN)   And using James as the example

13   that after you -- so you addressed this with him several

14   times, he still had a problem, that's when you brought

15   it up to Shawn and then Patrick.

16       A.   Correct.

17       Q.   Besides Victor and James, did you -- was there

18   any other pump operators that were assigned to you at

19   any point during your employment with Crest?

20       A.   No.

21       Q.   Were there occasions when other pump operators

22   would work on a job with you other than Victor and James

23   when you were working with Crest?

24       A.   There was a couple of occasions where they had

25   an individual that they wanted to be a pump operator or

1       A.    Well, what was called for.

2       Q.    And where would you get that in -- so far

3   we've only talked about a phone call you got from a

4   dispatcher.

5       A.    Right.  When you get the dispatch, you're

6   given directions or location -- actually location, and

7   nine times out of 10 you figure out your own directions

8   to get there.  And, like I said, you were given the

9   proposal for the job, and on that proposal it calls for

10   the amount of equipment -- you know, what equipment that

11   you're supposed to be taking and the cement blends.

12       Q.    Okay.  To your knowledge who at Crest would

13   assemble -- put together the right cement blends for

14   the -- for the job?

15       A.    Who would actually do the blending?

16       Q.    Yeah.

17       A.    Or who would do it on paper?

18       Q.    The actual blending.

19       A.    Folks in the bulk plant.

20       Q.    Okay.  You as a cementer didn't have any role

21   in doing the actual blending.  Right?

22       A.    No, sir.

23       Q.    But you -- you did -- as a cementer did you

24   have a role to make sure that the right blend -- at

25   least they told you the right blend had been prepared?

Page 152

1    A.    Yes.

2              MR. WYNNE:   Objection, form.

3    A.    You're given the -- what'd I call it -- the

4    proposal, and it's got everything listed on there, you

5    know, the chemicals.  And then the bulk plant when they

6    load the truck, they have a load sheet that tells what

7    they put into that truck, what cement blend and back

8    blend, whatever types of chemical additives are in it.

9    A matches B or A matches B [sic].

10             Q.    And as a cementer that was something you were

11   doing, is making sure A matched B.

12             A.    Sure.

13             Q.    Okay.  Besides making sure that the cement mix

14   matched what was -- that you were provided matched the

15   proposal, what other things were you doing to make sure

16   that the right equipment was going to be in place for

17   the job?

18             MR. WYNNE:   Objection, form.

19             A.    Well, you have to know whether or not -- what

20   size head you're taking -- you know, cement head -- so

21   you've got to look on the proposal, what -- what type of

22   job is this that you asked me earlier:  surface,

23   intermediate, production.  And with each one of those

24   it's a different size cement head, and with that there's

25   a different manifold that matches that cement head

SCOT CARLEY

Page 153

 1    because they vary in size and different bowls and

 2    there's changeovers and stuff like that.  And you have

 3    to know whether or not there's a silo on the location if

 4    it's a bigger job.  Because if there's a silo on

 5    location, then you have to have an air trailer.  If

 6    you're going to be pumping mud as a displacement, how --

 7    you know, is there going to need to be a -- another pump

 8    out there, a boost pump.  You know, how far are we going

 9    to have to get this mud, you know, from the pits all the

10    way around to the rig to the pump.  Well, then a boost

11    trailer may need to be out there.  Has a field

12    supervisor already taken one out there?  That's just it,

13    just making sure.

14        Q.    (BY MR. MANN)  The air pump or the boost

15    trailer that you referenced, how would those be

16    transported to a job site?

17        A.    Sometimes the cementer would do it, and

18    sometimes a field supervisor would do it.

19        Q.    Did you --

20        A.    Or sometimes the cementer has left one -- you

21    know, they've left one on this rig because they know

22    that you're coming back to do that rig again and it's

23    going to be the same set up so it's already parked there

24    on the rig location.

25        Q.    When you were a cementer at Crest, did you

SCOT CARLEY

Page 154

1  ever have to transport and -- a boost trailer or an air

2  pump to a job site?

3       A.   Sure.

4       Q.   How would you -- physically how would you do

5  that?  Was it in your truck?  Was it on a trailer?

6       A.   It's on a trailer.  You back up and hook it up

7  to your -- to the ball on the bed of your truck -- or

8  the bumper of your truck and hook up the lights and

9  go.

10      Q.   The cement head, how -- depending on what

11  size, I understand, but how would that get transported

12  to the job site?

13      A.   In the bed of your truck.

14      Q.   In the bed of the cementer truck?

15      A.   Uh-huh.

16      Q.   That's a yes?

17      A.   Yes.  Sorry.

18      Q.   And the cement heads are at the yard.

19      A.   Yes.

20      Q.   And then how are they placed in the back -- in

21  your truck?  Do you -- they're too heavy to lift.  Am I

22  right or --

23           MR. WYNNE:  Objection, form.

24      Q.   (BY MR. MANN)  Bad question.  How would the

25  cement heads get into your truck?

SCOT CARLEY

Page 155

1        A.    Well --

2                MR. WYNNE:   Objection, form.

3        A.    -- it depends on what you're using.  I mean

4   like a five and a half -- four and a half or a five and

5   a half -- well, like a five and a half is what you used

6   on the production jobs, which I did quite a few of

7   those, and quite frankly, I can pick one of those up and

8   put it in the bed of my truck.  I mean they're not

9   really overly heavy.  Maybe 150 pounds, something like

10  that.

11       Q.    (BY MR. MANN)  Were there some cement heads

12  that you were not physically able to lift yourself?

13       A.    Sure.  There are cement heads that are way too

14  big for me to lift, sure.

15       Q.    (BY MR. MANN)  And how would your cement heads

16  get in the back of your truck if you needed one of those

17  larger ones?

18       A.    Which I didn't, but if I was going to use one

19  of those, you'd have to use -- it's like a -- a winch or

20  whatever.  You know, it's on this track that goes back

21  and forth with a chain and stuff.

22       Q.    But let's not talk about anything you didn't

23  do.  I guess my que- -- did you ever -- were there ever

24  job you had to work on where there was a cement head

25  needed that you couldn't physically lift to put in the

1      A.    And stuff that had to be taken out there and

2   then match -- you're supposed to take two pumps.  Okay.

3   I've got two pumps.

4      Q.    Okay.  You mentioned earlier that before

5   leaving the shop, you told me you would have a JSA.  Is

6   that right?

7      A.    Before I left the yard.

8      Q.    Yard.  I'm sorry.

9      A.    Yes.

10     Q.    And what would that JSA cover?

11     A.    Pretty much, just like I said, everybody's

12   logs up to date, does everybody have the right safety --

13   does everybody got safety glasses, gloves, got all their

14   personal -- their PPE.  Went over, again, like I said,

15   load sheets.  That's when I would look at load sheets

16   because the drivers were told what trucks to get in by

17   dispatch, and the load sheets were in the trucks so the

18   drivers bring the load sheets to me.  I verified all of

19   it and then just what job we were going to go on and

20   where we were going and how we were going to get there

21   and, you know, how I wanted the equipment on the road,

22   you know, pump, this truck, that truck.  If you've got

23   an inexperienced driver, you don't want him last in the

24   line.  You know, you'd want him further up in the group

25   so he didn't get lost.  Get everybody's phone numbers in

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

1    case somebody did get lost.

2        Q.   So you would in the JSA -- would you be the

3    one conducting the JSA?

4        A.   Yes.

5        Q.   In that JSA you would tell every- -- those

6    going with you the order in which the convoy -- you

7    wanted the convoy to go to the job.

8        A.   Well, it's as far as the bul- -- as far as the

9    bulk cement went, yes.  I mean the pump was always in

10   front.  That's just -- that's common everywhere you go,

11   every company.

12       Q.   How would you get the directions to the

13   location where you were going to be going?

14            MR. WYNNE:  Objection, form.

15       A.   Usually off of like a GPS or map like on my

16   phone -- on my company phone.  That would be -- excuse

17   me.  That would be specific to getting to the area, but

18   then there's like a lease road that you might have to go

19   down that's 15 miles, and the dispatcher would you give

20   that information.  Go down to the second cattle guard

21   and turn right.  Then go to the third one and turn left,

22   and then you're looking for rig so and so and -- but as

23   far as on the pavement, I would -- I would take care of

24   the directions most of the time.

25       Q.   (BY MR. MANN)  And you would communicate those

1    look for the water tanks to find out where you're going

2    to put your pump.  And if you can get any equipment

3    spotted in, you spot in what equipment you can get

4    spotted in and -- go ahead.  You look like you want to

5    ask.

6         Q.    That's okay.  I don't want to interrupt you.

7         A.    Spot what equipment that you can get spotted

8    in, and once you get that done, then you go introduce

9    yourself to the company man, identify yourself as an

10   employee of Crest, you know, and get all the pertinent

11   information that you need to get from him, which takes a

12   few minutes.  And then you go back out, and you just go

13   until you're at a stopping point, you know.  If you can

14   get all your equipment in, you get all your equipment

15   in.  If you can't, well, then you get what you can and

16   rig up what you can as far as your iron, test your water

17   and then wait.  Wait until they move stuff out of the

18   way so you can get the rest of your equipment in and

19   finish getting everything rigged up.

20        Q.    Who -- who would decide -- you used the term

21   "spot your equipment".

22        A.    Uh-huh.

23        Q.    Who would decide where your equipment was

24   going to be spotted?

25        A.    It's not a decision.  You get the pump as

Page 166

1    cement crew is the liaison between the company man and

2    the cement crew?

3                    MR. WYNNE:  Objection, form.

4        A.   Well, whoever -- if there's a QAQC guy out

5    there, he's going to be the main liaison.  If there's a

6    field supervisor, then he's going to be.  If it's just

7    the cementer, then he's the person.

8        Q.   (BY MR. MANN)  Okay.  Did you work any jobs as

9    a cementer at Crest when you were the individual who was

10   the liaison --

11       A.   Sure.

12       Q.   -- with the company man?

13       A.   Sure.

14                   MR. WYNNE:  Objection, form.

15       Q.   (BY MR. MANN)  If there is no QAQC individual

16   present on site or a field supervisor, is the cementer

17   the highest ranking Crest employee on the job site?

18                   MR. WYNNE:  Objection, form.

19       A.   Sure.

20       Q.   (BY MR. MANN)  You mentioned earlier that

21   you -- in talking with the company man, you have to get

22   information from him.

23       A.   Yes.

24       Q.   What information are you getting from him?

25       A.   Well name and number, AFE numbers, which is, I

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

SCOT CARLEY

Page 167

1    guess -- I'm not sure exactly what they -- I mean they
2    use those numbers for billing and stuff like that in the
3    office.  Just verifying what size hole, what size casing
4    they're using, the depth.  Those are all -- those are
5    all numbers that you're going to use to calculate like
6    what your displacement is, making sure that you've got
7    the right cement head to fit that casing, you know, you
8    were given the right -- your information at the yard so
9    you're not trying to put a five and a half on a
10   seven-and-a-half-inch casing, the size and the weight of
11   the casing because that determines your volume of
12   your -- helps determine your volume of your
13   displacement.  It's one of the -- one of the factors in
14   the equation.  Information on has everything gone all
15   right with the well?  Is there anything that I need to
16   know about, you know, before I start the job?  Just
17   things like that.
18        Q.   The information that you get from the company
19   man, is it being given to you on a piece of paper?  Are
20   you having to record it somewhere?
21        A.   Sometimes it was given to you on a piece of
22   paper.  Sometimes you could write it down.
23        Q.   Okay.  In the circumstance when you had to
24   write it down, where would you write it down?
25        A.   Anything.  A notepad, a tally book,

Page 168

1    whatever -- it was your choice, whatever you wanted

2    to.

3        Q.    What was your practice as a cementer at

4    Crest?

5        A.    I had a couple of tally books.

6        Q.    Okay.  When you say "a couple of tally books,"

7    would you mean you had one and you filled it up and then

8    you started a new one, or did you keep simultaneously

9    different tally books?

10       A.    No simultaneous.  Fill one up and go the

11   next.

12       Q.    Okay.  What type of information would you

13   write down in your tally book as a cementer at Crest?

14       A.    Everything that you see on that job log right

15   there and, like I said, the size and the weight of the

16   casing, the depth of the hole and then your slurries

17   that you figure out in your displacement.

18       Q.    So the calculations you would have to make,

19   you'd make those in your tally book.

20            MR. WYNNE:  Objection, form.

21       A.    Yeah, if you were using a tally book and which

22   I did so, yes.

23       Q.    (BY MR. MANN)  Do you still have any of the

24   tally books that you had when you were working at

25   Crest?

Electronically signed by Stephanie Blair (001-351-611-7450)          fdeb2873-86cf-4319-bf3a-b8447d324e37

Page 171

1    couple of jobs.  I guess that would be it.

2         Q.   (BY MR. MANN)  But as far a regular practice,

3    there wouldn't be any other employees.

4         A.   Huh-uh.

5         Q.   Got it.

6         A.   No.

7         Q.   So were the bulky and pump operator, were

8    they -- from a physical standpoint were they able to do

9    the rig up?

10        A.   Ideally, yes.

11        Q.   Okay.  When you say you would go help with rig

12   up, what do you mean by that?

13        A.   You're piecing together numerous sections of

14   high pressure two-inch line.  They go from the manifold

15   at the end of the cement pump to the well head, and

16   these are in different lengths and different sec- -- you

17   know, different sections.  Those all -- along with

18   chicksuns and bails -- which I don't know if you guys

19   went over bails or not -- along with those different

20   pieces depending on whether you had to make a corner,

21   you know, and go to the end of a stand pipe that goes

22   up, you take all this stuff off the end of the pump and

23   wing it together and hammer -- use a hammer and pound

24   the hammer unions together.

25                   And then you've got to run water lines

1   from the water tank to the pump, which are, you know,
2   low pressure.  They're just water lines so you have to
3   wing those together off of the -- off the water tanks to
4   the pump, and then you to run dry cement lines from the
5   bulk trucks in from the silos to the pump.  If you got
6   an air trailer, you got to run an air hose to the bottom
7   of the silo, which is just a little bitty hose like
8   that.  If you're having to pump mud and use mud
9   displacement, you've got to run your suction in from
10   your mud supply to the pump and then your pumping side
11   from that mobile pump to the big cement pump.
12              Those would be all the things that I
13   could think of as far as rigging up.
14       Q.   Were there any parts of the rig up procedure
15   that you just described that you as the cementer would
16   be the only one that was able to perform it?
17       A.   Absolutely.
18       Q.   Which portion?
19       A.   Well head connection.
20       Q.   Okay.  And you say "well head connection,"
21   what do you mean?
22       A.   The cement head.
23       Q.   Okay.
24       A.   Actually attaching that cement head to the
25   casing.

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

1       Q.    Okay.

2       A.    You were the -- nobody was -- they couldn't do

3   that while you're down on the ground.  You -- nobody

4   from the rig could do it, nobody from your crew.  You

5   absolutely had to be the one doing that.

6       Q.    Other than the attaching the cement head to

7   the well casing, were there any parts of the rig up

8   procedure that only you -- that you as the cementer were

9   the only one that could perform?

10              MR. WYNNE:   Objection, form.

11      A.    No.

12      Q.    (BY MR. MANN)  Okay.  Once the rig up

13  procedure is complete, is that when you can start

14  actually pumping cement?

15      A.    No.

16      Q.    What's the step -- intermediate step?

17      A.    Well, you -- let me back up.  You have a

18  JSA.

19      Q.    Okay.  When does a JSA take place?

20      A.    You have a JSA prior to rig up, and then prior

21  to pumping you have a JSA.  Everybody from the Crest

22  crew, everybody from the rig crew and the company man go

23  meet next to the company man's trailer.  You have a JSA.

24  That's a pretty standard form that comes from Crest.

25  You just print it out.  You've typed in the rig name and

SCOT CARLEY

Page 174

1    number and what members from Crest are present, and then

2    you go sit and hold a JSA.  And it takes about as much

3    time as it takes to smoke a cigarette, because that's

4    when anybody that smoked would usually smoke a

5    cigarette.

6         Q.   The JSA you mentioned having before rig up,

7    who takes part in that JSA?

8         A.   Just the rig -- I mean just the crew from

9    Crest.

10        Q.   Okay.

11        A.   Because you've spotted your equipment.  "Okay.

12   Everybody come here.  This is what we want you to do,

13   and this is how I want you to do it.  And watch your" --

14   you know, it's pretty standard safety stuff:  your pinch

15   points and all that kind of thing.

16        Q.   Would you as a cementer be the one to lead

17   that JSA, the one before rig up?

18        A.   Yes, I do both of them.

19        Q.   Okay.  And then -- I call it the "big JSA"

20   with everyone on site, that would be before you started

21   the pumping operation.  Correct?

22        A.   Correct.

23        Q.   And you mentioned that -- you said that you

24   would be the one to run that JSA as well.

25        A.   I would run it.  Eight out of 10 times company

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

1    man's going to interject.  Driller might interject half

2    the time because -- but it's not particular to what our

3    crew's doing.  The company man, "This is what I want you

4    on the rig crew to be doing while they're doing this."

5            Q.    Okay.  After the big JSA with -- that's my

6    term, but you understand what I'm --

7            A.    I understand what you're saying.

8            Q.    Okay.  What's the next step after that?

9            A.    Pressure testing.

10           Q.    Okay.  And who performs the pressure

11   testing?

12           A.    Cementer and the pump operator.

13           Q.    Okay.  After -- assuming the pressure testing

14   is -- goes as anticipated, what's the next step?

15           A.    Releasing pressure off the line and then -- I

16   know you want to know the next step.  And from there you

17   go into pumping into it to make sure you've got

18   circulation on the well, circulation meaning that you

19   can pump into the casing and you get returns that come

20   back out on the other end --

21           Q.    Okay.

22           A.    -- basically so you can move fluids through

23   the entire -- through the well that you're pumping

24   through.

25           Q.    And once you've confirmed that circulation is

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

SCOT CARLEY

Page 177

1      A.    Cementer.

2      Q.    Okay.  Do you place the plug in the cement

3  head -- was it your practice -- before you arrived on

4  site or when you were on site?

5      A.    No, on -- on site.

6      Q.    Okay.  How long would it take to put the plug

7  in the cement head?

8            MR. WYNNE:  Objection, form.

9      A.    Not long.  Maybe five minutes.

10     Q.    (BY MR. MANN)  Okay.  So we're at the point

11 that you're dropping the plug.  Assuming the plug is

12 dropped and lands where it's intended -- or no?

13     A.    No, it doesn't land.

14     Q.    It doesn't land.

15     A.    No, you drop your plug.  There's a little wire

16 on it sticks out the stop of the cement head called a

17 tattletale.  You watch it go, and it indicates to you

18 that the plug has left the cement head.  Then you start

19 displacement, and you're displacing with water and

20 pushing that plug and, on the other side of the plug,

21 that cement.  And that plug's wip- -- it's called a

22 wiper plug, and it's wiping the instead of the casing,

23 getting whatever -- hopefully whatever little bit of

24 residue's on the inside of the casing.  And you pump

25 that over the calculated -- the calculated amount, you

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

1    know, whether it's 150 barrels or 450 barrels, you know.

2    And you pump that until it lands at the float.

3         Q.    Where does that calculation come from?  Your

4    example was 150 or 450.

5         A.    You get the information from the company man,

6    how deep --

7         Q.    Got it.

8         A.    -- and where the float is --

9         Q.    Okay.

10         A.    -- in that casing, and then you do your

11    calculations on that.

12         Q.    Okay.

13         A.    Pretty standard.

14         Q.    So you're doing the displacement.  The plug

15    lands on the float.

16         A.    Correct.

17         Q.    As -- what's the next step from there?

18         A.    It pressures up, and that's lets you know that

19    it's landed.  You hold that pressure, and most of the

20    time the company man wants you to hold that pressure on

21    it for two to three minutes.  Most of them do.

22                    Once that two or three minutes has

23    expired, you go open some relief valves on the pump

24    which releases that pressure back into the pump.  And

25    then you watch for water to be returning, and I -- just

1    so you know what I mean, cement's heavier than water,

2    and it's called u-tubing.  So if there's water coming

3    back to the pump, that means that the cement's pushing

4    the water back out, which means the plug hasn't held.

5    So that's what you're looking for, for you -- release

6    the pressure.  You get maybe a barrel or two of water

7    back.  It stops.  Okay.  The plug held.

8        Q.   And once you've gotten confirmation that the

9    plug has held, what is the next step?

10       A.   You look at the company man, who's generally

11   down on the ground standing next to the pump, and he's

12   looking at you.  And you give him a thumbs up, you know,

13   it held, and he'll say, "Okay," and he tells you at that

14   point that you can go ahead and rig down.

15       Q.   Okay.  Of the processes that you've described

16   to me, are there certain parts of that job that take

17   longer than others in general?

18            MR. WYNNE:  Objection, form.

19       Q.   (BY MR. MANN)  Let me ask a better question.

20       A.   Okay.

21       Q.   You told me that putting the plug in the

22   cement head takes maybe five minutes.

23       A.   It should.

24       Q.   I imagine that there are other parts of the

25   job that you've just described that take longer than

SCOT CARLEY

Page 180

1    five minutes.  Would that be accurate?

2         A.    Correct.

3         Q.    Okay.  Are there parts of the job that on a

4    routine basis take longer than others?

5         A.    Pumping operations.

6         Q.    Okay.  Pumping.  Does that include

7    displacement or no?

8         A.    Yes.

9         Q.    Okay.  So the pumping operations you mean --

10   are you talking about pumping the cement in and then --

11        A.    Mixing and pumping the -- from start to

12   finish:  your pressure test, mixing and pumping cement,

13   dropping your plug, displacing -- all the way through

14   displacement until your plug lands.

15        Q.    That pumping opera- -- it takes the lo- -- of

16   all the processes you've described, that takes the

17   longest of any of them.

18        A.    Sure.  It can take six hours.

19        Q.    Okay.

20        A.    It could.

21        Q.    Sure.  And I understand that every job is

22   different, but I'm going to ask you about rig up and rig

23   down.  First, which takes long- -- if you can answer,

24   which takes longer, rigging up or rigging down?

25        A.    I personally -- I'm sorry.  I kind of laugh

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

Page 188

1    Q.   Do you know whether the date that you would

2    put on cement job logs, if that was the date you

3    received notice of the job, or was that the date that

4    the job was actually performed?

5              MR. WYNNE:  Objection, form.

6    A.   Date that it's performed.

7    Q.   (BY MR. MANN)  And then in the middle of this

8    first page of Exhibit 6 on the left-hand side, I see

9    various times, and then the right hand side I see it

10   says:  Description of operation and materials.

11             Do you see that?

12   A.   I do.

13   Q.   And would I be correct to say that that's a

14   description of the actual work that was performed on --

15   for this job?

16   A.   For that particular job, yes.

17   Q.   Then further down on the left-hand side -- and

18   I'll just point it out to you so you'll see what I'm

19   talking about -- job titles and names.  Do you see

20   that?

21   A.   I do.

22   Q.   And what are those name- -- not -- not exactly

23   on this sheet, but why would certain names be on a

24   cement job log?

25             MR. WYNNE:  Objection, form.

Page 189

```
 1        A.    I --

 2        Q.    (BY MR. MANN)  Let me just ask the questions.

 3   Are these the individuals that would be on the job

 4   site?

 5        A.    Correct.

 6        Q.    Okay.  And the example we're looking at,

 7   Exhibit 6, it shows the cementer as Scot Carley.

 8   Correct?

 9        A.    Correct.

10        Q.    Do you see that number underneath your name?

11        A.    It's the truck number.

12        Q.    Which truck number?

13        A.    The truck that I drove.

14        Q.    Your pickup?

15        A.    Correct.

16        Q.    All right.  And then underneath "Operator,"

17   there appears to be two names on this one --

18        A.    Correct.

19        Q.    -- a Victor and a Trevor.

20        A.    Right.

21        Q.    You told me about a Victor earlier.

22        A.    Right.

23        Q.    And then I don't know -- do you remember a

24   pump operator named Trevor?

25        A.    He wasn't a pump operator.  That was the guy
```

Page 193

1      A.   Yes, I did what was required of me --

2      Q.   Okay.

3      A.   -- by --

4      Q.   And the --

5      A.   -- documenting the time.

6      Q.   The last -- and the last entry it says 21:20,

7   and next to that it says:  Rig down and move off

8   location.

9                    Do you see that?

10     A.   Yes.

11     Q.   Okay.  Can you tell by looking at this job log

12  whether 21:20 was the time that you actually left

13  location, or was that the time when you began rig down

14  if you can tell?

15     A.   That's just a -- I know that what -- that's

16  when you start rigging down, and you don't -- I didn't

17  put move off location.  That's just trying to shorten up

18  the job log.  This one we started rigging down, and then

19  we left location after we were done rigging down.

20     Q.   Is there anything on Exhibit Number 6 -- that

21  cement job log, the first page -- that will show you --

22  where you can tell when you actually left location?

23     A.   No, I guess not.

24     Q.   When you were working at Crest, did you ever

25  recommend that Crest hire anyone in any position?

1      A.   No.  I was asked, but no.

2      Q.   Who were you asked --

3      A.   I don't remember what his name was, but there

4   was a gentleman came -- that we worked with at Shack

5   that came and applied for a cementer's position at -- at

6   Crest.  And Patrick asked me about him, and I said that

7   he was a good pump operator, but I didn't know anything

8   about his cement skills.

9      Q.   Okay.  So you do remember at least one -- you

10  remember one example where Patrick asked your input

11  about a job applicant.

12     A.   Correct.

13     Q.   But you don't remember that individual's name.

14     A.   No, he just asked me if I knew him.

15     Q.   Did to your knowledge that individual get

16  hired?

17     A.   No, he didn't get hired.

18     Q.   Do you know why he didn't get hired?

19     A.   I have no idea why he didn't get hired.

20     Q.   During your employment with Crest, did you

21  ever -- were you ever asked about recommendations for

22  pay raises for any individuals?

23     A.   No.

24     Q.   Did you ever provide any -- voluntarily

25  provide any information regarding pay rates for any

Page 198

1        A.    I don't want to say high standards.  I would

2   say fair.  I would be fair, but this is what I expect,

3   this is what Crest expects and this is what we're going

4   to do.

5        Q.    And you would communicate those expectations

6   to those who were working with you.

7        A.    Sure.

8        Q.    Do you believe that you served as a good

9   example to the other Crest employees that you worked

10  with?

11       A.    I believe I did.

12       Q.    Do you believe that you were able to motivate

13  the crew -- the Crest employees that were working with

14  you?

15            MR. WYNNE:  Objection, form.

16       A.    At times, yes.

17       Q.    As a cementer with Crest, were there ever

18  occasions where you had -- were asked to train any

19  employees -- Crest employees that were working with

20  you?

21            MR. WYNNE:  Objection, form.

22       A.    I was asked for James to show him how to do

23  the calculations -- job calculations, you know, for

24  figuring out your cement weights and your slurries and

25  displacement and then to help fine-tune him on the pump

Page 199

1    as far as running the pump was concerned.

2          Q.    (BY MR. MANN)   Are there any other examples

3    you can recall when you were asked to train any Crest

4    employees?

5          A.    No.

6                    MR. WYNNE:   Objection, form.

7          Q.    (BY MR. MANN)   Okay.   I'm going to show you

8    another document I'll now mark as Exhibit 7.

9                    (Exhibit 7 marked.)

10         Q.    (BY MR. MANN)   This is a two-page document

11   previously produced as D-CAR-1459 and 1460.   I want to

12   ask you if you can identify what this document is.

13         A.    This is pretty much what you went over with

14   your crew before you left the yard.

15         Q.    The document -- it's entitled Morning Tailgate

16   Meeting Agenda.   Right?

17         A.    That's how Crest titled it, yes.

18         Q.    So this -- would this be -- this document's

19   what you would go over with your crew before you left

20   the yard to go to a job site.   Is that what I

21   understand?

22         A.    That's fair.

23         Q.    Well, I don't know if it's fair or not, but is

24   it accurate?

25         A.    Yeah, it's -- yes.

Page 204

1    hole.

2         Q.    Okay.

3         A.    It's just simple math.

4         Q.    All right.  Continuing on it says:  Told

5    company man what could P-O-T --

6         A.    Potentially.

7         Q.    -- potentially happen, and he said that it was

8    never an issue and to wake up the tool hand and we would

9    con- -- consult together.

10        A.    Correct.

11        Q.    What -- do you recall what you told the

12   company man could potentially happen?

13        A.    When you have real high chlorides like that,

14   when they hit cement, it can cause it to flash set.

15        Q.    And that's a problem.  Correct?

16        A.    That's a definite problem.

17        Q.    As the cementer at Crest, did you understand

18   or believe it was some part of your job to point out to

19   the company man a potential problem like this?

20                   MR. WYNNE:  Objection, form.

21        A.    Well, if there's any potential problem, it's

22   your job to communicate that.

23        Q.    (BY MR. MANN)  Continuing on with the

24   description, it says:  We decided to change to fresh at

25   210-240 barrels.

SCOT CARLEY

Page 214

```
 1        A.   You know what, it looks familiar, but I don't
 2   remember what it would be for.  I mean that's not my
 3   handwriting on there so...
 4        Q.   That's fine.
 5        A.   I mean I really truly do not remember.
 6             MR. MANN:  I'm about to switch gears.
 7   Does anyone need a break or want a break?
 8             MR. WYNNE:  I'll stretch my legs for a
 9   couple of minutes.
10             MR. MANN:  That's fine.
11             (Recess.)
12        Q.   (BY MR. MANN)  Mr. Carley, as a cementer with
13   Crest, what did you consider your main job
14   responsibilities to be?
15             MR. WYNNE:  Objection, form.
16        A.   Completion of a job in a safe manner I
17   suspect.
18        Q.   (BY MR. MANN)  Completion of a job.  What do
19   you mean by that?
20        A.   Cementing job from start to finish.
21        Q.   Okay.
22        A.   Making sure that it's done correctly and
23   safely.
24        Q.   Did -- as part of making sure the job is done
25   completely, is that making sure that the equipment
```

Page 215

1    operates properly?

2         A.   Sure.

3         Q.   Is part of making sure the job is completed

4    properly, does that entail making sure that members of

5    this cement crew do their jobs?

6              MR. WYNNE:  Objection, form.

7         A.   I would say sure, ensuring that every member

8    of the team is doing what they're supposed to do.

9         Q.   (BY MR. MANN)  Did you consider part of your

10   job to make sure that the company man was satisfied with

11   Crest's performance?

12             MR. WYNNE:  Objection, form.

13        A.   Well, sure.

14        Q.   (BY MR. MANN)  Did you have occasion with --

15   as a cementer with Crest where you worked on a job with

16   the same company man more than once?

17        A.   Sure.

18        Q.   Okay.  Did you as a cementer feel any interest

19   in making that company man happy?

20             MR. WYNNE:  Objection, form.

21        A.   Customer service.

22        Q.   (BY MR. MANN)  Did you consider customer

23   service part of your job?

24        A.   Well --

25             MR. WYNNE:  Objection, form.

Page 216

1      A.    -- you're providing a service, so sure.   It is
2  the service industry.
3      Q.    (BY MR. MANN)   What do you -- in your opinion
4  what do you believe makes a good cementer?
5      A.    Accuracy, knowledge.  You have to have a
6  certain amount of capability or ability.
7      Q.    Capability or ability in what sense?
8      A.    Running equipment and being able to
9  troubleshoot problems with equipment, knowing what's
10 going on downhole -- you know, different downhole
11 conditions, how the well's reacting to what you're
12 doing.
13     Q.    Anything else that you believe makes a good
14 cementer?
15     A.    No.
16     Q.    Okay.  You told me earlier that -- I wrote
17 down that -- I think you said either the company or
18 management wanted James to be moved up.
19     A.    That's what I was told.
20     Q.    Who told you?
21     A.    Patrick.
22     Q.    Did he tell you what position he was -- that
23 Patrick wanted James to be moved into?
24     A.    He said that they wanted him in a pickup.
25     Q.    And when you say "in a pickup" --

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

1    letting everyone know -- letting this group of people

2    know about the work that your team did on this job.

3    Correct?

4         A.    Correct.

5         Q.    Show you the next document I'll mark as

6    Exhibit 15 --

7         A.    He's a field supervisor.

8         Q.    -- previously produced as D-CAR-2471.

9                (Exhibit 15 marked.)

10        A.    Okay.

11        Q.    (BY MR. MANN)  This is what appears to be an

12   e-mail you sent on March 13, 2014, regarding a job,

13   Apache CC 3729.  Correct?

14        A.    Okay.

15        Q.    Looking at the end of the third line of the

16   e-mail -- starting there at least, it says:  Saw some

17   improvement in Collin.  His attitude was in the right

18   place, did what he was told.

19                Do you see that?

20        A.    Yeah.

21        Q.    Did I read that accurately?

22        A.    Yes.

23        Q.    Who was Collin?

24        A.    He was a -- he's laughing -- I'm sorry --

25   because he remembers Collin as well.  Collin was a

Electronically signed by Stephanie Blair (001-351-611-7450)          fdeb2873-86cf-4319-bf3a-b8447d324e37

Page 231

1    driver, drove a bulk truck that, I guess, had

2    problems -- just from what I was told -- with -- on just

3    about every job and just about every person that he went

4    and worked with.   Patrick asked me if he could send him

5    with me and then to report back, you know, Hey, what's

6    his attitude like, you know.   I mean because I think at

7    that point from what I gathered -- not that I took part

8    in it -- but from what I gathered, they were determining

9    whether or not they were going to keep him on board,

10   like if he was a fit or if he wasn't a fit and they were

11   going to have to let him go.

12        Q.   Okay.

13        A.   And so I think that that's what that was about

14   if I remember correctly because Patrick had asked me to

15   just, "Hey, take him out with you and see what his

16   attitude's like," you know, and -- and consequently one

17   of the things was -- is for some reason he really jived

18   with me and he listened to me and he liked me and he

19   worked hard for me, you know, and for the rest of the

20   guys that were out there -- he made himself part of the

21   team when he was with me.   And so that's what that was

22   about.

23        Q.   Okay.   So in Exhibit 15 you did report back to

24   Patrick as you were asked.

25        A.   Sure.   Sure.

1    Q.    Okay.   Look at the next document -- go back to

2    15 real quick.   Below the e-mail, you see that little

3    tag that says:   Sent from my iPhone?

4    A.    Sure.

5    Q.    Do you see that?

6    A.    Yeah.

7    Q.    Now, I believe that means you -- it would have

8    been sent from your phone rather than from your laptop.

9    Would that be accurate?

10   A.    Correct.   Yeah.

11   Q.    Do you remember as a matter of your practice

12   whether you would al- -- you know, routinely send

13   your -- these reports -- these e-mails from your phone

14   as compared to your laptop?

15   A.    I think it would be safe to say that they were

16   from the iPhone because about the only time you had your

17   laptop open was when you were on location or if you were

18   doing your receipts and stuff, you know, for your credit

19   card.

20   Q.    All right.   Let's look --

21   A.    You know like -- so maybe when you stopped and

22   got gas after you left the job or you're on the way to

23   another one and you've got a second to send it out over

24   the phone, yeah.

25   Q.    Was it easier to send out those e-mails --

Electronically signed by Stephanie Blair (001-351-611-7450)          fdeb2873-86cf-4319-bf3a-b8447d324e37

1       A.      Sure.

2       Q.      -- through your phone?

3       A.      Sure.

4       Q.      Let's look at the next document I've marked as

5    Exhibit 16.   It's been produced as D-CAR-2509.

6                       (Exhibit 16 marked.)

7       A.      Okay.

8       Q.      (BY MR. MANN)   Mr. Carley, this is an e-mail

9    you sent March 24th of 2014, regarding a Kinder Morgan

10   job.   Correct?

11      A.      Squeeze job, yes.

12      Q.      Looking at the text of -- the body of the

13   e-mail you sent starting in the second -- middle of the

14   second line, I'm going to read it.   It says:   All hands

15   in equip [sic] worked as though they had been together

16   for years, which was quite refreshing.   Trevor is coming

17   along at a steady pace on the pump.   I have high hopes

18   for him.   James is the bomb.   Brandon and Joe were just

19   what we needed them to be.

20                      Do you remem- --

21      A.      (Reading)   Gonna call in and see what's next.

22      Q.      Right.   Do you remember seeing this e-mail?

23   Do you remember any specifics about this?

24      A.      No.

25      Q.      Okay.   There's a Trevor reference in this.

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

Page 234

1    We've talked about Trevor before.

2         A.    Yeah, I know.  You're pretty concerned with

3    Trevor.

4         Q.    Well, I see Trevor's --

5         A.    I'm sorry.  Ask away.

6         Q.    Sure.  Trevor's name is in a number of e-mails

7    that you've sent.

8         A.    Yeah, because they wanted Trevor to be a pump

9    operator.

10        Q.    And you were reporting back to this -- the

11   recipients of this e-mail about Trevor's performance.

12   Correct?

13        A.    Yeah.  The supervisors, cementers and

14   managers, yeah.

15        Q.    And this comment, "James is the bomb," do you

16   remember why you would have written that?

17        A.    Probably because he -- he did a good job on

18   that job.

19        Q.    Okay.  And you were reporting back on James'

20   performance as well?

21        A.    I don't know that you would call it "reporting

22   back".  It's just letting everybody else know what

23   happened.

24        Q.    Okay.  You were letting everyone else know

25   about James' performance.

Electronically signed by Stephanie Blair (001-351-611-7450)                    fdeb2873-86cf-4319-bf3a-b8447d324e37

Page 235

1      A.   Sure.

2      Q.   Okay.

3      A.   Which is pretty much routinely what they did,

4  too, with their operators.

5      Q.   And this says:  Brandon and Joe were just what

6  we needed them to be.

7           Do you remember who Brandon and Joe were?

8      A.   Have no idea.

9      Q.   All right.  Let's look at the next document --

10 and I only have a few more.

11     A.   Okay.  I'm just laughing.  I'm sorry.

12     Q.   -- marked as Exhibit 17 --

13     A.   I bet Trevor's in this one.

14     Q.   -- previously been produced as D-CAR-2512.

15          (Exhibit 17 marked.)

16     A.   Sure enough.  There's Trevor and James.

17          Go ahead.

18     Q.   (BY MR. MANN)  This appears to be an e-mail

19 you sent, Mr. Carley, on March 31st, 2014, regarding a

20 Guy Phillips Wright job.  Do you see that?

21     A.   Okay.

22     Q.   Starting at the fourth line from the bottom of

23 the e-mail, it says:  All hands -- I'm going to read it:

24 All hands did a stupendous job, and I was very impressed

25 with the two from this yard.

Electronically signed by Stephanie Blair (001-351-611-7450)          fdeb2873-86cf-4319-bf3a-b8447d324e37

```
 1   UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                 MIDLAND DIVISION

 3   SCOT CARLEY, ON BEHALF OF        *
     HIMSELF AND ALL OTHERS           *
 4   SIMILARLY SITUATED               *
                                      *
 5          Plaintiff,                *
                                      *
 6   VS.                              *  NO. MO:15-CV-00161-RAJ-DC
                                      *
 7   CREST PUMPING TECHNOLOGIES,      *
     LLC,                             *
 8                                    *
            Defendant.                *
 9   _____

10             REPORTER'S CERTIFICATE

11             ORAL DEPOSITION OF

12                SCOT CARLEY

13             Taken April 8, 2016

14   _____

15

16             I, Stephanie J. Blair, Certified

17   Shorthand Reporter in and for the State of Texas, do

18   hereby certify to the following:

19             That the witness, SCOT CARLEY, was duly

20   sworn by the officer and that the transcript of the oral

21   deposition is a true record of the testimony given by

22   the witness;

23             I further certify that pursuant to FRCP

24   Rule 30(f)(1) that the signature of the deponent:

25             XXX was requested by the deponent or a
```

SCOT CARLEY

258

1  party before the completion of the deposition and

2  returned within 30 days from date of receipt of the

3  transcript.  If returned, the attached Changes and

4  Signature Page contains any changes and the reasons

5  therefor;

6          _____ was not requested by the deponent or

7  a party before the completion of the deposition.

8          I further certify that I am neither

9  attorney nor counsel for, related to, nor employed by

10  any of the parties to the action in which this testimony

11  was taken.  Further, I am not a relative or employee of

12  any attorney of record in this cause, nor am I

13  financially or otherwise interested in the outcome of

14  the action.

15          Subscribed and sworn to on this the 18th

16  day of April 2016.

17

18

19          _____

20          Stephanie J. Blair
            CSR No. 6819, Expires 12/31/16
21          Firm Registration No. 155
            Permian Court Reporters, Inc.
22          605 W. Texas
            Midland, Texas 79706
23          (432) 683-3032

24

25